RECEIVED 2019 JUN 12 PM 4:36 CLERK U.S. DISTRICT COURT

FILED JUN 12 2019 THOMAS G. BRUTON CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ADVATECH, LLC )
)
Claimant )
)
v. )
)
ILLINOIS POWER GENERATING COMPANY )
)
Respondent )

1:19-cv-03956
Judge John J. Tharp, Jr
Magistrate Judge Jeffrey T. Gilbert

**COMPLAINT TO CONFIRM ARBITRATION AWARD**

Pursuant to the Federal Arbitration Act 9 U.S.C. § 9, Advatech. LLC ("Advatech") moves to confirm and enter judgment upon an Award of Arbitrators ("Final Award") dated June 12, 2019, and entered in the arbitration styled Advatech, LLC v. Illinois Power Generating Company, American Arbitration Association Case Number 01-17-0001-5690 (the "Arbitration"). A true and correct copy of the Final Award is attached as Exhibit "A" hereto. The Final Award incorporated by reference an Interim Award dated March 25, 2019, which set forth all of the relief afforded Advatech other than the expenses of the Arbitration, which were set forth in the Final Award. A true and correct copy of the Interim Award is attached as Exhibit "B" hereto.

**Jurisdiction and Venue**

1. Advatech is a Delaware limited liability company comprised of two members: AECOM Energy & Construction Inc. (an Ohio corporation with its principal place of business in New Jersey); and Mitsubishi Hitachi Power Systems Americas (a Delaware corporation with its principal place of business in Florida). Advatech's business is the design, manufacture, and installation of air quality control equipment for power plants. One of the technologies Advatech

provides is flue gas desulfurization ("FGD") proprietary technology to reduce sulfur dioxide emissions control in coal plants.

2.     Illinois Power Generating Company ("IPGC") is an Illinois corporation. Upon information and belief, its principle place of business is in Texas. Neither AECOM Energy & Construction Inc. nor Mitsubishi Hitachi Power Systems Americas are incorporated in or have their principal place of business in Illinois or Texas. Upon information and belief, IPGC is now a subsidiary of Vistra Energy Corp., which on information and belief is headquartered in Texas. IPGC owned and operated merchant electric generation facilities in Illinois, including a coal-fired power plant located near Newton, Illinois (the "Newton Plant").

3.     Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1332(c)(1), because, without limitation, this action is between citizens of different states and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

4.     Venue is proper in this Court, pursuant to Section 9 of the Federal Arbitration Act (the "FAA").[1] The Parties' arbitration agreement (copied below) did not specify the court to which an application to confirm the arbitration award should be made, but rather stated "[t]he award of the arbitrator(s) shall be final and binding upon the Parties and specifically enforceable in a court of competent jurisdiction."[2] Section 9 of the FAA provides, "[i]f no court is specified in the

---

[1] 9 U.S.C. §§ 1-2 provides that the Federal Arbitration Act applies to agreements to arbitrate in contracts evidencing a transaction involving commerce among the several States. The power plant project at issue in the Arbitration was located in Illinois. (Interim Award, p. 1.) Advatech LLC is comprised of members with their principal places of business in New Jersey and Florida. The Claimants' principal place of business, on information and belief, is Texas. The design, fabrication, and installation of the FGD systems at the power plant necessarily involved the work of persons in several states and the shipment of equipment and materials fabricated outside the state of Illinois to the power plant.

[2] The parties' dispute arises out of IPGC's termination of the parties' Second Amended and Restated Newton FGD System Engineering, Procurement, Construction and Commissioning Services Contract (the "Contract,") effective December 15, 2014. Interim Award, p. 1. A copy of Contract Section 21.3, the parties' agreement to arbitrate, is attached as Exhibit "C" hereto.

agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." The hearing of the Arbitration was conducted in Chicago, Illinois, from October 1, 2018 through October 5, 2018. Interim Award at 4. As such, the Award is deemed to have been made in Chicago.

## The Arbitration

5. Pursuant to the Contract, Advatech designed, fabricated and had installed certain FGD system equipment to improve IPGC's Newton Plant. At dispute in the Arbitration was the amount of compensation IPGC owed Advatech upon IPGC's termination for convenience. *Id.*

6. The Contract provided that the parties' dispute over the amount Advatech was owed would be resolved by binding arbitration. Section 21.3 of the Contract provides:

> 21.3 **Arbitration**. All claims, Disputes, and other matters in question not resolved by mediation between the Parties to the Contract arising out of or relating to the Contract Documents or the breach thereof shall finally be decided by arbitration by a mutually agreed upon arbitrator. The arbitration shall take place at Owner's facilities and be conducted in accordance with the American Arbitration Association Construction Industry Arbitration Rules or a mutually agreed upon set of arbitration rules. This agreement to arbitrate and any other agreement or consent to arbitrate entered into in accordance herewith will be specifically enforceable under the prevailing arbitration law of any court having jurisdiction. Notice of demand for arbitration must be filed in writing with the other Party to the Contract and with the AAA or other mutually agreed to arbitrator. The demand for arbitration must be made within a reasonable time after the Dispute has arisen but in no event prior to thirty (30) Business Days after the mediation session stated under 21.2 above, unless otherwise agreed by the Parties. In no event may the demand for arbitration be made if the institution of legal or equitable proceedings based on such Dispute is barred by the applicable statute of limitations. If the total Dispute, exclusive of interest and arbitration costs, does not equal or exceed one million dollars, the arbitration shall be heard by one neutral arbitrator. If the total Dispute equals or exceeds one million dollars, then the arbitration shall be heard by three neutral arbitrators. Any arbitration may be consolidated with any other arbitration proceedings. Either Party may join any other interested parties. The award of the arbitrator(s) shall be final and binding upon the Parties and specifically enforceable in a court of competent jurisdiction.[3]

[3] See Exhibit C.

7. On March 15, 2017, Advatech filed its Demand for Arbitration against IPGC for breach of contract. Interim Award at 3. Pursuant to the Parties' arbitration agreement they agreed that the Arbitration would be pursuant to the AAA Construction Industry Arbitration Rules. *Id.* The parties followed AAA procedures to select distinguished and experienced construction lawyers as arbitrators. *Id.* There has been no allegation made by either party that the arbitrators were biased or unsuitable. The AAA arbitrators under whose auspices the Arbitration was conducted were as follows (the "Tribunal"):

Donald Gavin, Chair
Gavin ADR, LLC
755 Potomac River Road
McLean, Virginia 22102

Michael Nuechterlein
Michael F. Nuechterlein, ADR, LLC
560 Frederick Street
Frankenmuth, Michigan 48734

Albert Bates, Jr.
Pepper Hamilton LLP
500 Grant Street, Suite 5000
Pittsburgh, PA 15219-2507

8. The Tribunal gave the parties ample opportunity to develop their cases and be heard prior to the time the Tribunal issued the Interim and Final Awards.

9. As stated in the Arbitrator's Interim Award, the Tribunal considered both initial and rebuttal witness statements filed by both parties and initial and rebuttal expert reports. *Id.* at 3-4. The Tribunal also issued procedural orders, under which the parties exchanged documents, took depositions, submitted expert reports, issued pre-hearing briefs on facts and points of law, and submitted witness statements. *Id.*

10. From October 1, 2018 through October 5, 2018, the Tribunal presided over a five-day evidentiary hearing conducted in Chicago, Illinois. *Id.* at 3. Counsel for Advatech and IPGC attended the hearing and questioned witnesses on direct and cross-examination and presented argument in support of their respective positions. At the end of the evidentiary hearing, both parties

rested their cases, and neither objected that they were not provided an opportunity to be fully heard. *Id*. at 4.

11. The Tribunal explained in the Interim Award that it properly considered the parties' evidence and argument:

> The Tribunal has considered all the factual and legal assertions at issue in this Arbitration that were set forth in the parties' numerous submissions. The Tribunal also considered all factual and legal assertions made during the evidentiary hearing, including its receipt of more than 400 exhibits and its evaluation of the credibility of each of the witnesses who appeared during the hearings, and its evaluation of the draft Partial Awards and other post-hearing submissions of the parties.

*Id.*

**The Arbitration Award**

12. The Tribunal deliberated and on March 25, 2019, issued a 44-page Interim Award in Advatech's favor and invited Advatech to submit a fee petition to recoup various arbitration costs and expenses. *See id.* at 42–43. Advatech submitted a fee petition, to which IPGC had the opportunity to submit a Response and Advatech a Reply.

13. On June 12, 2019, the Tribunal issued its written Final Award, and the AAA, after duly acknowledging the award, delivered it to Advatech and IPGC. The Final Award incorporates the Interim Award. Final Award at 1.

14. The Tribunal awarded Advatech $36,913,168 as the amount owed on the Contract ($36,835,273 for the termination payment and $77,895 for demobilization costs). Interim Award at 41. The Tribunal also awarded Advatech pre-award simple interest in the amount of 5% per annum beginning October 30, 2016 and continuing until the date the Final Award. *Id.* at 40. The Tribunal set the amount of interest up to the Interim Award, stating that "[t]he pre-award interest due and owing to Advatech for the period from October 30, 2016 through March 30, 2019 [the date of the Interim Award] is $4,454,863, with interest continuing to accrue at a daily rate of

$5,056.60 from March 31, 2019 through the date of the Final Award." *Id.* at 43. There were 74 days between the Interim Award and the Final Award, so the remaining pre-award interest is $374,188.40, with a total sum of pre-award interest of $4,829,051.40. Final Award at 1.

15. The Tribunal also awarded Advatech $4,079,804.24 for Advatech's arbitration costs and expenses. *Id.* at 11.

16. The Tribunal also awarded Advatech post-award interest accruing at the simple rate of 9% per annum, commencing on the date following the issuance of the Final Award, June 13, 2019. *Id.* at 12. The Tribunal explained, "for purposes of the calculation of post-award interest, the principal amount shall be $45,822,023.64, with post-award interest accruing at the rate of nine percent (9%) simple interest per annum commencing on June 13, 2019 and continuing until fully paid." *Id.* at 12. The daily interest on that principle at 9% per annum is $11,298.58

WHEREFORE, Plaintiff Advatech, LLC, hereby requests that this Court enter an Order in its favor and against Illinois Power Generating Company providing the following relief:

a) confirming the Interim Award of the Tribunal dated March 30, 2019 and the Final Award of the Tribunal dated June 12, 2019;

b) directing the entry of judgment on the Interim Award and Final Award in favor of Advatech and against IPGC in the sum of $45,822,023.64; with post-award interest to accrue at the rate of $11,298.58 per calendar day beginning on June 13, 2019 and running through the date that IPGC satisfies the judgment;

c) awarding Advatech the costs of this action, and any attorneys' fees and expenses to which it is entitled; and

d) granting Advatech such further relief as the Court considers just and proper.

Dated: June 12, 2019

Respectfully submitted:
ADVATECH, LLC
By:

[signature]

One of its Attorneys

Steven G. M. Stein
Carl L. Popovsky
David Z. Smith
STEIN RAY LLP
222 West Adams Street, Suite 1800
Chicago, Illinois 60606
(312) 641-3700
Fax: (312) 641-3701

sstein@steinraylaw.com
cpopovsky@steinraylaw.com
dsmith@steinraylaw.com

RECEIVED
2019 JUN 12 PM 4:37
CLERK
U.S. DISTRICT COURT

# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**CONSTRUCTION INDUSTRY ARBITRATION TRIBUNAL**

| | | |
|---|---|---|
| ADVATECH, LLC | ) | |
| | ) | |
| Claimant | ) | |
| | ) | |
| v. | ) | **No. 01-17-0001-5690** |
| | ) | |
| ILLINOIS POWER GENERATING COMPANY | ) | |
| | ) | |
| Respondent. | ) | |

# FINAL AWARD

**FINAL AWARD: Advatech LLC v. Illinois Power Generating Company**

**WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated December 15, 2014, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having issued an Interim Award dated March 25, 2019, do hereby issue this FINAL AWARD.**

## INTRODUCTION

As noted above, the Tribunal issued an Interim Award dated March 25, 2019 ("Interim Award")[1]. The Interim Award is incorporated as if fully set forth here, and is considered part of this Final Award.

By way of summary, in the Interim Award, we ruled in favor of Advatech and against IPGC and awarded damages to Advatech in the principle amount of $36,913,168. Interim Award at 43. In addition, we awarded simple interest at the rate of 5% per annum beginning October 30, 2016 and continuing until the date of issuance of the Final Award. Id. We calculated the amount of pre-award interest due and owing to Advatech for the period from October 30, 2016 through March 30, 2019 to be $4,454,863, with interest continuing at accrue at a daily rate of $5,056.60 from March 31, 2019 through the date of the Final Award. Id. As of the date of this Final Award, fixed as June 12, 2019, Advatech is entitled to additional pre-award interest in the amount of $374,188.40 (74 days @ $5,056.60/day), bringing the total amount of pre-award interest to which Advatech is entitled through the date of the Final Award to $4,829,051.40.

Further, in the Interim Award, we determined that Advatech shall be entitled to post-award interest at the simple rate of nine percent (9%) per annum commencing on the day following the issuance of the Final Award, or June 13, 2019. For purposes of the calculation of

[1] Unless stated otherwise in this Final Award, capitalized terms shall have the same meaning as defined in the Interim Award.

post-award interest, the principal amount shall be the sum of $36,913,168 plus: a) $4,829,051.40, the amount pre-award interest accrued as of the date of the Final Award, and b) the amount awarded to Advatech in this Final Award for legal fees and other expenses related to the arbitration. Id. at 43.

With respect to the parties' claims for attorneys' fees and other expenses attendant to the arbitration, the Tribunal determined in the Interim Award that it has authority under Rules 48(c) and 48(d)(ii) to award of attorneys' fees and attendant arbitration expenses in the Final Award. Id. at 42. Further, the Tribunal stated that it would exercise its authority under the Rules and would entertain a petition from Advatech for recovery of its attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other fees or expenses attendant to the arbitration. Id. The Tribunal advised that it would issue a separate order establishing a protocol whereby Advatech shall submit summaries supporting its attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other fees or expenses attendant to the arbitration, IPGC would have an opportunity to object and respond to Advatech's request, and Advatech would have an opportunity for a concise reply. Id.

The Tribunal issued a Scheduling and Procedural Order Governing Fee and Cost Submission dated April 2, 2019 ("Scheduling Order"), which established the schedule and procedure for the fee petition. In accordance with the Scheduling Order, Advatech submitted its Petition for Arbitration Fees and Expenses on April 19, 2019 ("Fee Petition"). IPGC submitted its Response on May 3, 2019 ("IPGC Response"), and Advatech submitted its Reply in Support on May 13, 2019 ("Advatech Reply"). The hearings were declared closed in accordance with AAA Rule 40 on May 13, 2019.

For the reasons set forth in the Interim Award, as well as the reasons set forth above, each party has had a full and fair opportunity to be heard on all issues presented in this arbitration, including all issues related to the quantum of attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other expenses attendant to the arbitration to be awarded to Advatech, and these issues related to Advatech's arbitration fees and costs are now before the Tribunal for resolution.

## I. ARBITRATION FEES AND EXPENSES SOUGHT BY ADVATECH

In its Fee Petition, Advatech seeks reimbursement of $4,413,748.67 in arbitration costs and expenses as summarized below:

| | |
|---|---|
| Stein Ray Fees and Expenses | $2,640,864.23 |
| Expert Witness Fees and Expenses | $1,328,787.55 |
| E-Discovery Consultant Fees and Expenses | $110,152.46 |
| AAA Charges (including arbitrator compensation and expenses) | $148,805.00 |
| Advatech Former Employee Fees and Expenses | $166,375.73 |
| Advatech Employee Travel Costs | $18,729.98 |
| Federal Express Charges | $33.72 |
| **Total** | **$4,413,748.67** |

With the exception of the Federal Express charges, each of the other items will be discussed below[2].

[2] While the Affidavits of Mr. Popovsky and Mr. Wortham reference a Federal Express charge of $33.72 purported to be a cost of the arbitration, neither affiant provides any further support for this charge. Accordingly, the request for reimbursement for this Federal Express charge is denied without further discussion.

A. Stein Ray Fees and Expenses

Carl Popovsky, a partner at Stein Ray who has been actively engaged in this matter since January of 2017, submitted an Affidavit in Support of the Fee Petition ("Popovsky Aff."). Mr. Popovsky's Affidavit describes in detail, with supporting invoicing and other documentation, the attorneys' fees and expenses for which Advatech seeks reimbursement. Popovsky Aff. at ¶¶ 9-15. In addition, Brian Wortham, Vice President and Controller, AECOM Power Group Construction Services, submitted an Affidavit in Support of the Fee Petition ("Wortham Aff."). Mr. Wortham attests that he created a spreadsheet showing all amounts that Advatech actually paid as a result of the arbitration, the so-called "31901 Report." The Wortham Affidavit and accompanying 31901 Report demonstrate that Advatech paid $2,894,171.95 to Stein Ray in fees and expenses related to the dispute with IPGC.

As described in detail in the Popovsky Affidavit, Advatech chose not to seek reimbursement for costs that arose as a result of related proceedings separable from the arbitration, including the bankruptcy court action, the mechanic's lien action, and a mediation. As a result of these reductions and other adjustments described in the Popovsky Affidavit, Advatech seeks reimbursement of $2,640,864.23 in Stein Ray legal fees and expenses. Popovsky Aff. at ¶ 13.

As an initial matter, the Tribunal notes that IPGC does not challenge the reasonableness of the legal fees and expenses charged by Stein Ray and paid by Advatech. Further, given the complexity of the issues presented, including the tedious nature of defending allegations of fraud, deception, and negligent and intentional misrepresentation, the amount in controversy, the rate structure and case staffing, and a myriad of other factors, the Tribunal finds that the legal

fees and expenses incurred by Advatech for this arbitration were reasonable for the services provided.

Rather than challenge the reasonableness of the legal fees and expenses, IPGC suggests that the Tribunal decline to award reimbursement of **any** Stein Ray legal fees and expenses to Advatech because: 1) fees should only be awarded in exceptional cases; 2) Advatech was awarded "less than half of what it claimed"; and 3) IPGC "arbitrated in good faith." IPGC Response at 2-6.

Contrary to these assertions of IPGC, Advatech was clearly and unequivocally the prevailing party in this action. IPGC asserted that Advatech had been fully paid under the Contract and was entitled to no further recovery. *See* IPGC Draft Award Submission at 30. In addition to being awarded $36,913,168 for the termination payment and demobilization costs, we found that, among other things, Advatech did not act deceptively, did not engage in fraud, and did not make any actionable intentional or negligent misrepresentations upon which IPGC reasonably relied. Interim Award at 39, 43. Suffice it to say that Advatech was clearly and unequivocally the prevailing party in this arbitration, and it was necessary for Advatech to bring this arbitration in order to recover the termination payment to which it was entitled under the Contract.

Furthermore, each party sought recovery of legal fees and expenses in its arbitration pleadings. *See* Interim Award at 41. *See also* Advatech Statement of Claim at 18; IPGC Supp. Answering Statement at 19; IPGC Prehearing Brief at 50. Near the conclusion of the arbitration hearings, each party expressly and unequivocally stipulated it was seeking reimbursement of its fees and costs incurred in the arbitration. *See* Interim Award at 41. *See also* Tr. at 1229.

In accordance with the Interim Award and as more fully described above, the Tribunal finds that the recovery of attorneys' fees and expenses by Advatech is just and equitable and within the scope of the agreement of the parties, and that an award of reasonable legal fees and expenses to Advatech is appropriate in this case. Accordingly, the Tribunal awards $2,640,864.23 to Advatech for the amounts that it paid to Stein Ray for legal fees and expenses attendant to this arbitration.

B. Fees and Expenses of Veritas Group and TM Financial Services

Advatech seeks reimbursement of $1,328,787.55 in expert fees and expenses attendant to the work performed by Veritas Group and TM Financial Services. Popovsky Aff. at ¶ 16(a). The TM and Veritas invoices are attached to the Popovsky Affidavit at Exhibits D and E. *Id.* The Wortham Affidavit and accompanying 31901 Report demonstrate that Advatech paid $985,266.45 to TM Financial and $343,521.10 to Veritas, for a total paid to those two firms of $1,328,787.55 related to this arbitration.

As an initial matter, the Tribunal notes that IPGC does not challenge the reasonableness of the expert fees and expenses sought by Advatech. Further, given the complexity of the issues presented, including defending the allegations of fraud, deception, and negligent and intentional misrepresentation, the nature of the services provided by the experts, the amount in controversy, the rate structure and case staffing by the experts, and a myriad of other factors, the Tribunal finds that the expert fees and expenses incurred by Advatech for this arbitration were reasonable.

IPGC contends that the AAA Rules "do not permit an award of: (i) expert witness fees and expenses ..." IPGC Response at 6. In support of its position, IPGC contorts the language of Rule 48, as well as Rules 55, 56, and 57. *See id.* at 7 – 9.

The Rules cited by IPGC do not limit the authority of the Tribunal to award expert fees and expenses to the prevailing party in appropriate cases. As set forth in Rule 48, the Tribunal has the authority to grant any remedy or relief that it deems just and equitable and within the scope of the agreement of the parties, including specifically an award of attorneys' fees if all parties have requested such an award.[3]

As highlighted in the preceding section of this Final Award, the language of the requests for relief submitted by IPGC in this matter belies the argument that it now advances, and demonstrates that each party sought recovery of expert fees and expenses from the other in this arbitration. In IPGC's Supplemental Answering Statement, IPGC made a broad request to recover **all costs of the arbitration**. Specifically, it sought "all of its costs of the arbitration, including its attorneys' fees and costs; and Awarding such other further relief in IPGC's favor as the Tribunal may deem equitable, just or proper." *Id.* at 19. In its Prehearing Brief, IPGC requested that the Tribunal award "IPGC all costs of the arbitration, including attorneys' fees and expenses ..." *Id* at 50. Finally, in its draft award, it uses the term "costs of arbitration" when asking the Tribunal to reserve its decision on the costs of arbitration. IPGC Draft Award at 30. Both IPGC and Advatech requested that the Tribunal award it all costs of the arbitration, including attorney's fees and expenses. The demand for "all costs of the arbitration" clearly and unambiguously includes a request for expert fees and expenses, e-discovery consultant fees and expenses, and similar costs that are reasonable and which are customarily incurred in preparing

[3] IPGC cites Rule 56 for the proposition that the "Tribunal lacks authority to award Advatech's witness fees and expenses and must deny Advatech's Fee Petition insofar as it requests such amounts." IPGC Response at 7. Rule 56 does not limit the authority of the Tribunal to award amounts paid to expert witnesses a part of the relief granted, just as it does not limit e-discovery fees and expenses or other types of costs incurred that are reasonable and customarily incurred in preparing and presenting the case for arbitration. Amounts paid to attorneys are only a portion of the costs of developing and presenting a case in arbitration, as noted by the Tribunal in the exchange with the parties on October 4, 2018. *See* Tr. At 1229 (statement by Chairman Gavin). Rule 48 broadly provides the Tribunal with the authority to grant any remedy or relief that it deems just and equitable and within the scope of the agreement of the parties.

and presenting the case for arbitration. Accordingly, the Tribunal finds that each party sought recovery from the other of the expert fees and expenses incurred in connection with this arbitration, and that the recovery of expert fees and expenses by Advatech is just and equitable and within the scope of the agreement of the parties.

For the foregoing reasons, as well as those set forth in the Interim Award, we award Advatech the amount of $1,328,787.55 for the expert fees and expenses it incurred for the services provided by Veritas Group and TM Financial Services in connection with this arbitration.

C. E-Discovery Consultant Fees and Expenses

Advatech seeks reimbursement of $110,152.46 in e-discovery consultant fees and expenses attendant to the services provided by Business Intelligence Associates Inc. ("BIA"). Popovsky Aff. at ¶ 16(b). The work performed by BIA is described in more detail in the Popovsky Affidavit and the BIA invoices are attached to the Popovsky Affidavit at Exhibit F. *Id.* The Wortham Affidavit and accompanying 31901 Report demonstrate that Advatech paid $110,152.46 to BIA for the services that it provided in connection with the arbitration.

As an initial matter, the Tribunal notes that IPGC does not challenge the reasonableness of the e-discovery consultant fees and expenses sought by Advatech. Further, given the issues presented, including defending the allegations of fraud, deception, and negligent and intentional misrepresentation, the nature of the services provided by BIA, the amount in controversy, the amount charged by BIA, and various other factors, the Tribunal finds that the $110,152.46 charged by BIA and paid by Advatech is reasonable for the services provided in connection with this arbitration.

As discussed above, the Tribunal finds that the fees and expenses of e-discovery vendors, whether internal to a law firm or external as an independent provider, are ordinarily and customarily incurred in preparing and presenting the case for arbitration. Whether these costs are categorized as "costs of the arbitration," attorneys' expenses, expert fees and expenses or otherwise is immaterial. The Tribunal finds that each party sought recovery from the other of the all costs incurred in connection with this arbitration, and that the recovery of e-discovery fees and expenses by Advatech is just and equitable and within the scope of the agreement of the parties.

For the foregoing reasons as well as those set forth in the Interim Award, we award Advatech the amount of $110,152.46 for e-discovery fees and expenses it incurred for the work performed by BIA in connection with this arbitration.

D. AAA Charges (including arbitrator compensation and expenses)

Advatech seeks reimbursement of $148,805 that it paid to the American Arbitration Association for arbitration fees and compensation and expenses of the Arbitrators. While Rule 56 provides the Tribunal with the authority to assess the arbitration fees and arbitrator compensation and expenses against one of the parties, we decline to do so in this case. The fees of the AAA and the fees and expenses of the arbitrators shall be borne by the parties as incurred. The Tribunal finds that IPGC conducted the arbitration in good faith, and put forward a vigorous defense while not engaging in obstructionist behavior or otherwise making the proceedings more costly that they needed to be. To the contrary, as the arbitrators told each party at the conclusion of the hearings, this case was well presented throughout by highly competent counsel, and the cooperation of counsel was instrumental in presenting the case in a very efficient manner. *See* Tr. at 1540-1542.

E. Advatech Former Employee Fees and Expenses and Employee Travel Costs

Advatech seeks reimbursement of $166,375.73 in former employee fees and expenses, as well as $18,729.98 in Advatech employee travel costs, incurred attendant to this arbitration. While the Tribunal has the authority to award these costs to Advatech, it declines to do so. The Tribunal finds that it would not be just and equitable for IPGC to be compelled to reimburse Advatech for amount paid to Mr. Smith or Mr. Brown under their consulting agreements with Advatech and/or AECOM. Likewise, the Tribunal finds that it would not be just and equitable for IPGC to be compelled to reimburse Advatech for travel expenses incurred by Advatech employee witness, nor for travel expenses incurred by in-house counsel for AECOM or Mitsubishi Hitachi Power Systems.

## II. SUMMARY OF AWARD REGARDING ARBITRATION FEES AND EXPENSES SOUGHT BY ADVATECH

Our Award regarding Advatech's request for arbitration costs and expenses is summarized below:

| | **Amount Sought** | **Amount Awarded** |
|---|---|---|
| Stein Ray Fees and Expenses | $2,640,864.23 | $2,640,864.23 |
| Expert Witness Fees and Expenses | $1,328,787.55 | $1,328,787.55 |
| E-Discovery Consultant Fees and Expenses | $110,152.46 | $110,152.46 |
| AAA Charges | $148,805.00 | $0 |
| Advatech Former Employee Fees and Expenses | $166,375.73 | $0 |
| Advatech Employee Travel Costs | $18,729.98 | $0 |
| Federal Express Charges | $33.72 | $0 |
| **Total** | **$4,413,748.67** | **$4,079,804.24** |

## III. FINAL AWARD

The Tribunal has considered each and every of the parties' allegations and arguments, and chose which of those to address in the Interim Award and/or this Final Award. This Final Award is rendered in full and complete accord, settlement and satisfaction of all claims, counterclaims and issues (whether or not addressed herein) that were or could have been submitted in the Arbitration relating to or arising out of the Project or the Contract. Except for those claims granted below, any and all other claims, counterclaims, requests for relief and other issues are hereby expressly denied.

In consideration of its analysis as set forth above and in the Interim Award, the undersigned arbitrators hereby issue this Final Award.

A. Termination Payment and Demobilization Costs: As set forth in the Interim Award, we find in favor of Advatech and against IPGC in the amount of $36,913,168, representing $36,835,273 for the termination payment and $77,895 for demobilization costs, each of which are due under the terms of the Contract. Interim Award at 43.

B. Pre-Award Interest: As set forth in the Interim Award, we award Advatech simple interest payable at the rate of 5% per annum beginning October 30, 2016 and continuing until the date of issuance of the Final Award, which we fix as June 12, 2019. Interim Award at 43. Accordingly, we award Advatech pre-award interest in the amount of $4,829,051.40 at the rate of 5% simple interest per annum for the period from October 30, 2016 to June 12, 2019.

C. Arbitration Fees and Expenses: As set forth above, we award Advatech $4,079,804.24 in arbitration fees and expenses.

D. AAA Fees and Arbitrator Compensation and Expenses: The administrative fees of the AAA totaling $37,142.39 and the compensation and expenses of Arbitrators totaling $361,390.39 are to be borne as incurred.

E. Amount of Final Award: For the foregoing reasons, as well as those set forth in the Interim Award, we award Advatech the total sum of $45,822,023.64, which is inclusive of the termination payment and demobilization costs, pre-award interest, and arbitration fees and expenses, and we award post-award interest as calculated below.

F. Post- Award Interest: In the Interim Award, we determined that Advatech shall be entitled to post-award interest at the simple rate of nine percent (9%) per annum commencing on the day following the issuance of the Final Award, or June 13, 2019, and continuing until fully paid. *See* Interim Award at 43. For purposes of the calculation of post-award interest, the principal amount shall be $45,822,023.64, with post-award interest accruing at the rate of nine percent (9%) simple interest per annum commencing on June 13, 2019 and continuing until fully paid.

**FINAL AWARD: Advatech LLC v. Illinois Power Generating Company**

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

DATED this 12th day of June, 2019.

ORDERED BY THE ARBITRAL TRIBUNAL:

Donald G. Gavin, Esq. (Chair)

Mike Nuechterlein

Michael Nuechterlein

Albert Bates, Jr.

FINAL AWARD: Advatech LLC v. Illinois Power Generating Company

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

DATED this 12th day of June, 2019.

ORDERED BY THE ARBITRAL TRIBUNAL:

Donald G. Gavin, Esq. (Chair)

Michael Naechterlein

Albert Bates, Jr.

-13-



# EXHIBIT B

**AMERICAN ARBITRATION ASSOCIATION**

**CONSTRUCTION INDUSTRY ARBITRATION TRIBUNAL**

| | | |
|---|---|---|
| ADVATECH, LLC | ) | |
| | ) | |
| Claimant | ) | |
| | ) | |
| v. | ) | **No. 01-17-0001-5690** |
| | ) | |
| ILLINOIS POWER GENERATING COMPANY | ) | |
| | ) | |
| Respondent. | ) | |

# INTERIM AWARD

**INTERIM AWARD: Advatech LLC v. Illinois Power Generating Company**

**TABLE OF CONTENTS**

I. Introduction and Arbitral Procedure .... 1

A. The Project and the Contract .... 1

B. The Parties and their Counsel .... 2

1. Claimant Advatech .... 2

2. Respondent IPGC .... 2

C. The Arbitration Proceedings .... 3

1. Commencement of Arbitration and Selection of Arbitrators .... 3

2. Testimony and Expert Reports Considered by the Tribunal .... 3

II. The Parties' Claims and Defenses .... 4

A. Advatech's Claim for Termination Payment .... 5

B. IPGC's Defense to Advatech's Termination Payment Claim .... 5

C. Advatech's Calculation of the Termination Payment for Purposes of its Mechanic's Lien .... 6

D. Advatech's Claimed Demobilization Costs .... 8

E. Interest and Attorneys' Fees and Expenses .... 8

III. The Tribunal's Analysis .... 9

A. Section 25.5.1.1 of the Second Amended Contract .... 9

1. Legal Standard for Determining the Parties' Intentions .... 10

2. The Language of Section 25.5.1.1 is Ambiguous .... 12

3. Illinois Rules of Contract Construction .... 14

4. Typical and Customary Method for Determining Payment at Termination .... 15

5. Circumstances at the Time the Parties Agreed to the Second Amended Contract .... 16

B. Amount of the Termination Payment Due to Advatech Pursuant to Section 25.5.1.1 of the Second Amended Contract .... 20

**INTERIM AWARD: Advatech LLC v. Illinois Power Generating Company**

1. **Calculation of Termination Payment Due to Advatech ........ 20**
2. **Analysis of Section 25.5.1.1 and the Parties' Stated Intentions ........ 21**

**C. Other Issues Raised by the Parties ........ 29**

1. **Second Amended Contract Section 25.5.2 ........ 29**
2. **Second Amended Contract Section 25.7 ........ 30**
3. **Unreasonable Profit / Unenforceable Penalty ........ 31**
4. **Alleged Deceptive Conduct ........ 32**

**IV. Interest, Legal Fees and Costs ........ 40**

**A. Interest ........ 40**

**B. Legal Fees and Costs ........ 41**

**V. Interim Award ........ 42**

**INTERIM AWARD: Advatech LLC v. Illinois Power Generating Company**

**WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated December 15, 2014, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue following reasoned Interim Award in accordance with American Arbitration Association Rule L-5 and Paragraph 24 of Scheduling and Procedural Order 1 dated 31 July 2017.**

## I. INTRODUCTION AND ARBITRAL PROCEDURE

### A. The Project and the Contract

At dispute in this Arbitration is the amount of compensation a project owner, Respondent Illinois Power Generating Company ("IPGC"), owes the project EPC contractor, Claimant Advatech, LLC ("Advatech"), upon the owner's termination for convenience. The terminated contract is known as the Second Amended and Restated Newton FGD System Engineering, Procurement, Construction and Commissioning Services Contract, effective as of December 15, 2014 (the "Second Amended Contract" or "Contract"). Pursuant to the Contract, Advatech was to design, furnish and install new flue gas desulfurization units ("FGDs") at IPGC's Newton, Illinois coal-fired power plant (the "Project").[1]

After IPGC exercised its right to terminate for convenience, IPGC paid Advatech the termination payment it contends was due under the terms of the Contract. Advatech disagreed with the amount of the termination payment and filed this arbitration alleging breach of contract. Section 21.3 of the Contract contains an agreement to arbitrate disputes in accordance with the

[1] IPGC's Newton, Illinois coal-fired power plant will hereinafter be referenced as the "Plant." Prior to the Second Amended Contract, the parties entered into other written agreements relating to the Project: (a) the Engineering, Procurement, Construction and Commissioning Services Contract, effective as of January 1, 2011 (the Initial Contract"); (b) the Amended and Restated Engineering, Procurement, Construction and Commissioning Services Contract, effective August 22, 2011 (the "Amended Contract"); and the Agreement with Respect to Deceleration of Newton FGD System Engineering, Procurement, Construction and Commissioning Services Contract, effective April 7, 2012 (the "Deceleration Agreement").

American Arbitration Association Construction Industry Arbitration Rules.[2] Illinois substantive law governs the Contract, pursuant to Contract Section 31.0.

**B. The Parties and their Counsel**

**1. Claimant Advatech**

Advatech is a joint venture between AECOM Energy & Construction Inc. (formerly URS Energy & Construction, Inc.) and Mitsubishi Hitachi Power Systems Americas. During the entirety of the arbitral proceedings, Advatech was represented by Stein Ray LLP, with appearances at the arbitral hearing by Steven G.M. Stein, Carl L. Popovsky and Kathleen J. Mooney.

**2. Respondent IPGC**

At the time the parties entered into the Initial and Amended Contracts, the owner was known as Ameren Energy Generating Company ("Ameren"), a subsidiary of Ameren Corporation.[3] On December 2, 2013, Illinois Power Holdings, LLC, a subsidiary of Dynegy Inc. Ameren was renamed Illinois Power Generating Company, i.e. IPGC.[4] Ameren Energy Generating Company continued to exist, but under a different name.[5] For purposes of the matters addressed in this arbitration, we find that Ameren and IPGC are the same entity, and shall collectively refer to the entity as IPGC. When we refer to Ameren, we do so to distinguish the time period prior to the acquisition. During the entirety of the arbitral proceedings, IPGC was represented by White & Case LLP, with appearances at the arbitral hearing by Glenn M. Kurtz, Ank Santens, Damien Nyer, Felipe Nazar, and Susan Grace.

[2] Exhibit C-1, Second Amended and Restated Contract, Section 21.3.
[3] Joseph Mansker Initial Statement, para. 2.
[4] Hearing Transcript, October 4, 2018, 1182:5-12.
[5] *Id.*

## C. The Arbitration Proceedings

### 1. Commencement of Arbitration and Selection of Arbitrators

Advatech commenced this Arbitration by submitting its March 15, 2017 Demand for Arbitration with the American Arbitration Association ("AAA") under the AAA Construction Industry Arbitration Rules (the "Rules"). IPGC did not object to the AAA's jurisdiction or the application of the Rules. The AAA selected the following three Arbitrators in accordance with R-14 of the Rules: Donald G. Gavin, Esq. (chair); Albert Bates Jr., Esq.; and Michael F. Nuechterlein, Esq.[6] The Tribunal issued certain written orders during the Arbitration,[7] and engaged in several teleconferences during which the Tribunal gave certain additional orders.

### 2. Testimony and Expert Reports Considered by the Tribunal

Claimant on March 19, 2018, submitted the initial witness statements of Greg Smith, Greg Brown, Chris Purkins, Sean Buffington, and Amanda Burkemper (later withdrawn), and on April 23, 2018 submitted the rebuttal witness statements of Christine Creammer, Greg Smith and Greg Brown. Claimant on May 30, 2018, submitted the initial expert report of Al Nagorzanski, and on July 17, 2018 submitted the rebuttal expert reports of Al Nagorzanski and Ave Tucker.

Respondent on March 19, 2018 submitted initial witness statements of Joe Mansker and David Sladic, and on April 23, 2018 submitted the rebuttal witness statements of Joe Mansker

[6] The Arbitrators submitted disclosure statements pursuant to R-19 of the Rules, identifying their relationships, if any, with the parties and their counsel. Neither party challenged nor otherwise sought to disqualify any of the Arbitrators. In fact, each party expressly agreed that they had considered the disclosures that were made, and agreed that Messers. Gavin, Nuechterlein, and Bates shall serve as the arbitrators in this matter. *See* Scheduling and Procedural Order No. 1 at ¶1.

[7] The Tribunal's orders included: Scheduling and Procedural Order No. 1, which set a schedule for, among other things, pleadings, depositions, document production, witness statements, expert reports, and pre-hearing memoranda, and which was amended from time to time (July 31, 2017); Order and clarification in response to an application by IPGC concerning the scope of document production (November 7 and 10, 2017); Agreed Protective Order (November 21, 2007); Order granting leave to take depositions (May 24, 2018); Order choosing Chicago, Illinois as the site of the arbitral hearing, as the parties agreed not to conduct the hearing at the Newton power plant, as provided in the Contract (June 8, 2018); and Order that of the 30 hours available for the parties at the arbitral hearing, 12 would be allocated to Claimant and 18 would be allocated to Respondent (September 5, 2018).

and David Sladic. Respondent on May 30, 2018 submitted the initial expert report of Frank Regnery, and on July 17, 2018 submitted the rebuttal expert report of Frank Regnery.

The evidentiary hearing in this matter took place from October 1, 2016, through October 5, 2016, in the Hilton Palmer House Hotel, Chicago.[8] On or before October 5, 2016, both Claimant and Respondent rested their cases, and neither objected that they were not provided an opportunity to be fully heard.[9]

## II. THE PARTIES' CLAIMS AND DEFENSES

The Tribunal has considered all the factual and legal assertions at issue in this Arbitration that were set forth in the parties' numerous submissions.[10] The Tribunal also considered all factual and legal assertions made during the evidentiary hearing, including its receipt of more than 400 exhibits and its evaluation of the credibility of each of the witnesses who appeared during the hearings, and its evaluation of the draft Partial Awards and other post-hearing submissions of the parties.

[8] At the hearing, the following witnesses testified on behalf of Advatech: Greg Smith, Greg Brown, Chris Purkins, Christine Creammer, Al Nagorzanski (expert) and Ave Tucker (expert). By agreement of the parties, Sean Buffington did not testify, and his witnesses statement constitutes evidence. At the hearing, the following witnesses testified behalf of IPGC: Joe Mansker, David Sladic, and Frank Regnery (expert). All of the witnesses who testified were subject to cross-examination and were available for questioning by the Tribunal. In addition, the Claimant proffered more than 220 exhibits, and the Respondent proffered more than 185 exhibits, the vast majority of which were received into evidence by the Tribunal.

[9] Hearing Transcript, October 5, 2018, 1538:23 – 1540:17 Following the submittal of their respective post-hearing "draft awards" and other materials, the parties jointly, by letter dated January 8, 2019, requested that the Tribunal defer the issuance of the "Partial Award" until after February 14, 2019. By letter dated February 8, 2019, the parties jointly informed the Tribunal that they "do not request any further deferral of the issuance of the 'Partial' Award." By email dated March 1, 2019, the AAA advised the parties that the Tribunal had received the request to issue the "Partial Award" after the earlier joint request to defer issuance, and that the Tribunal had a draft in progress and would issue the "Partial Award" in due course. Neither party objected to the AA's direction with respect to the timing for the Tribunal's issuance of this Interim Award.

[10] Submissions included: (a) Demand for Arbitration (Claimant) (March 15, 2017); (b) Answering Statement (Respondent) (April 7, 2017) (b) Statement of Claim (Claimant) (July 21, 2017); (b) Supplemental Answering Statement (Respondent) (August 25, 2017); (c) Pre-Hearing Memoranda (both parties) (August 7, 2018); (d) Reply to Pre-Hearing Memoranda (both parties) (September 5, 2018); (e) Lists of Issues for Decision (both parties) (September 17, 2018); and (f) Opening Statements PowerPoint presentation (both parties) (October 1, 2018).

## A. Advatech's Claim for Termination Payment

In its Statement of Claim, Advatech asserted that IPGC breached Section 25.5.1.1 of the Contract by failing to pay Advatech a termination payment of approximately $81 million. Advatech calculated the amount due under Section 25.5.1.1 using the following formula and values:[11]

**((Contract Price) x (% complete at termination)) – (all prior payments) = (amount owed)**
**($433,298,890 x 77.25%) – $253,992,827 = $80,730,566**

Later, Advatech submitted the expert report of Alan Nagorzanski, in which Mr. Nagorzanski opined that the most appropriate value for the Project percent complete variable is 76.43% rather than the 77.25%.[12] The parties each presented testimony of the appropriate percent complete for the Project, and having carefully considered this issue, we find that the Project was 76.43% complete of as of September 2, 2016, the date of contract termination.[13]

It is not contested that IPGC has paid Advatech $33,333 as a termination payment, and accordingly Advatech concedes that the termination payment amount due to Advatech shall be reduced by $33,333 to reflect this credit.[14] Consequently, Advatech contends that appropriate amount due to it as a termination payment under Section 25.5.1.1 is $77,144,182.

## B. IPGC's Defense to Advatech's Termination Payment Claim

IPGC asserts that Section 25.5.1.1 provides for Advatech's termination payment to be measured by the amount of work performed from the end of the prior month (August 31, 2016)

[11] Advatech's Statement of Claim, p. 14.
[12] Advatech's Reply Pre-Hearing Memorandum, p. 29.
[13] Mr. Nagorzanski sets forth his basis for the conclusion that Advatech's total Project completion at termination was 76.43% at Section 3.2 of his expert report. We find his conclusion to be supported by the evidence presented during the hearing and we find his testimony on this point to be highly credible.
[14] IPGC's Pre-Hearing Memorandum, p. 25.

through the date of termination (September 2, 2016).[15] IPGC calculates the termination payment due under Section 25.5.1.1 based on the September 2016 payment set forth in the Payment Schedule, $500,000, prorated by the number of days Advatech worked during the month of termination. IPGC therefore calculated the termination payment due to Advatech as $33,333 (2 days / 30 days x $500,000), and paid that amount to Advatech.[16]

IPGC also seeks an order directing Advatech to release the mechanics' lien that Advatech placed on the Project property.[17] We do not address the validity of the Mechanic's Lien in this Interim Award as we find that we lack jurisdiction to do so.[18]

### C. Advatech's Calculation of the Termination Payment for Purposes of its Mechanic's Lien

By letter dated September 30, 2016, Advatech submitted its final invoice to IPGC, requesting a termination payment in the amount of $80,730,566.[19] On October 14, 2016, Advatech filed the Mechanic's Lien, attesting in a sworn affidavit that the balance due and owing from IPGC, at least for purposes of the lien filing, was $45,016,872.[20] Mr. Nagorzanski explained in detail the method by which the termination payment was calculated for purposes of the Mechanic's Lien:

> As reported on the Monthly Report for the period ending January 2, 2015, the Project was 66.2% complete by the end of December 2014, which Advatech used as the end of the Amended Contract period. Thus, 33.8% of the Project work remained. At the time of

[15] IPGC's Pre-Hearing Memorandum, p. 25.
[16] IPGC's Pre-Hearing Memorandum, p. 25.
[17] IPGC's Pre-Hearing Memorandum, p. 50. On October 14, 2016, Advatech filed a mechanic's lien against the Project for its work on the Project Ex. C-87 (hereinafter the "Mechanic's Lien"). As will be discussed in more detail in the next section, in the Mechanic's Lien, Advatech filed a sworn affidavit stating that the balance due and owing from IPGC was approximately $45 million.
[18] While do not address the validity of the Mechanic's Lien in this Interim Award, we find the calculation of the amount of the termination payment for the Mechanic's Lien to be probative evidence. This will be discussed in more detail in the next section of this Interim Award.
[19] Ex. C-84.
[20] *See* Ex. C-87. *See also* Nagorzanski Expert Report at Section 8.4.2.

termination, Advatech reported a Project completion percentage of 77.7%, meaning Advatech had completed 11.5% of the Project under the Second Amended Contract. At the time of termination, Advatech had completed 34.023% of the work remaining after the Second Amended Contract (11.5% / 33.8%).

Pursuant to Section 15.1 of the Second Amended Contract, the Project price was $433,298,890, and the amount previously paid or to be paid based on 2014 invoices was $228,992,827 ($228,259,886 + $732,941). Thus, the remaining total payment amount due under the Second Amended Contract was $204,306,063 ($433,298,890 - $228,992,827).

For purposes of calculating the unpaid portion of the remaining amounts that would be due at Project completion, Advatech multiplied the Second Amended Contract completion percentage of 34.023% by the total payment amount due under the Second Amended Contract, or $204,306,063, then subtracted payments Advatech received under the Second Amended Contract ($25,000,000). The unpaid portion under the Second Amended Contract for lien calculation was determined to be $44,511,052.[21]

The Mechanic's Lien calculation can be represented through the following formula[22]:

**((price to Owner under Contract) x (% complete of Work under Contract at termination)) – (all prior payments under the Contract) = (termination payment)**

**($$204,306,063 x 34.023%) – $25,000,000 = $44,511,052**

This compares to the calculation utilized by Advatech in the preparation of its Statement of Claim[23], which can be represented as follows:

**((Contract Price) x (% complete at termination)) – (all prior payments) = (amount owed)**

**($433,298,890 x 77.25%) – $253,992,827 = $80,730,566**

---

[21] Nagorzanski Expert Report at Section 4.3.2 to 4.3.4 (footnotes omitted). While not relevant to this discussion, the Mechanic's Lien also sought demobilization costs of $519,301, plus 15% profit and mark-up, for a total amount of $597,196. The addition of the demobilization costs to the termination amount of $44,511,052 as calculated above sums to a total of $45,016,872, which is the amount calculated in the Mechanic's Lien.

[22] The percent complete utilized in this calculation is based on a Project completion percentage of 77.7%, as used in the Statement of Claim, rather than the corrected completion percentage of 76.43% as determined by Mr. Nagorzanski and adopted by the Tribunal.

[23] The methodology used to calculate the termination payment in the Advatech's Statement of Claim and in its final invoice are identical. *See* Ex. C-84.

Thus, as demonstrated by these calculations, the defining difference between the calculation put forth by Advatech in the Statement of Claim and the Mechanic's Lien is whether, for purposes of calculating the termination payment, the Second Amended Contract is viewed as a) an amendment to perform the remaining scope of the Project for a price of $204,306,063; or, b) an entirely new contractual undertaking to complete the totality of the Project (including all work performed, and all payments received or to be received for work performed, prior to the December 15, 2014 Effective Date) for a Contract Price of $433,298,890. This issue will be discussed in detail later in this Interim Award.

## D. Advatech's Claimed Demobilization Costs

Both parties agree that Advatech is entitled to "all reasonable, actual, direct costs" of demobilization pursuant to Contract Section 25.5.1.2. IPGC paid Advatech for its out-of-pocket demobilization costs, but IPGC contends that Advatech's claimed 15% markup on its demobilization costs—which amounts to $77,895—is not a "direct cost."[24] Advatech applied the same 15% markup on all previous change order work, which the Owner accepted.[25] We find that Advatech's overhead and profit on demobilization work constitute recoverable costs under Contract Section 25.5.1.2. Therefore, we include $77,895 in this Interim Award for payment of these additional Advatech demobilization costs.

## E. Interest and Attorneys' Fees and Expenses

Advatech seeks pre-judgment interest pursuant to 815 ILCS 205/2, which provides in relevant part: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum

---

[24] In its Statement of Claim (p. 15), Advatech sought $519,301 in out-of-pocket costs, plus overhead and profit. IPGC paid Advatech $290,265 for demobilization costs on April 5, 2017, and an additional $229,036 on June 26, 2018, for a total of $519,301. (IPGC's Pre-Hearing Memorandum, p. 26).

[25] Initial Witness Statement of Greg Smith, ¶161.

for all moneys after they become due on any . . . instrument of writing."[26] Advatech contends that the amounts it is owed are liquidated or subject to easy computation, and therefore recoverable under Illinois law.[27] Advatech also seeks post-judgment interest in the amount of 9% from the date of the Final Award to the time of payment, pursuant to 735 ILCS 5/2-1303. In addition to these statutory bases, Rule 48(d)(i) of the AAA Construction Rules expressly authorizes the Tribunal to include interest in the Final Award at such rate and from such date as the Tribunal may deem appropriate.

In its arbitration pleadings, each party requests an award of attorneys' fees and expenses. The parties clearly and unequivocally confirmed these requests during the arbitral hearing.[28] Accordingly, pursuant to Rule 48(d)(ii) of the AAA Construction Rules, the Tribunal may include an award of attorneys' fees and expenses in the Final Award. In addition to any such award of attorneys' fees and costs, the Tribunal is authorized by Rule 48(c), as well as Rules 55, 56, and 57, to assess AAA fees, arbitrator and arbitration expenses, and arbitrator compensation among the parties in such amounts as the Tribunal determines to be appropriate.

## III. THE TRIBUNAL'S ANALYSIS

### A. Section 25.5.1.1 of the Second Amended Contract

Both parties agree that Section 25.5.1.1 of the Second Amended Contract governs the amount of the termination payment due to Advatech upon IGPC's termination for convenience. Further, each party states that the language of Section 25.5.1.1 is clear and unambiguous.

[26] Advatech's Reply Pre-Hearing Memorandum, p. 50. Under Illinois law, a construction contract is considered an "instrument of writing" for purposes of the interest statute. *Ameritech Information Systems, Inc. v. Bar Code Resources*, 331 F.3d 571, 575 (2003).

[27] See *Ameritech Information*, 331 F.3d at 575 (owner entitled to prejudgment interest on amount paid contractor for defective work); *Residential Marketing Group, Inc. v. Granite Investment Group*, 933 F.2d 546, 549 (7th Cir. 1991) (the interest statute does not require that the "instrument of writing" specify the exact amount due the creditor; it is enough if it contains a formula from which that amount can be computed with reasonable accuracy).

[28] Hearing Transcript, October 4, 2018, 1229: 1-12.

However, as summarized above, the parties offer markedly different interpretations of the meaning of Section 25.5.1.1, one leading to a conclusion that the termination payment due is more than $77 million, another leading to a conclusion that the termination payment is only $33,333 (and has been fully paid), and yet another proffered for purposes of the Mechanic's Lien that the termination payment due is approximately $44 million.

The operative language in the Second Amended Contract, Section 25.5.1.1, provides for a termination payment equal to the sum of:

> The cost of the Work performed based on the percent complete of the Project from the last scheduled payment to the date of termination, less all prior payments.

1. **Legal Standard for Determining the Parties' Intentions**

The Contract includes an Illinois choice of substantive law provision and neither party has objected to its application. Therefore, our decision will be guided by Illinois substantive law.

"Illinois uses in general a 'four corners' rule in the interpretation of contracts." *Bourke* v. *Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (*quoting AM Int'l Inc.* v. *Graphic Mgmt. Assocs.,Inc.*, 44 F.3d 572, 574 (7th Cir. 1995))). "Contracts 'must be construed to give effect to the intention of the parties which, when there is no ambiguity in the terms of the [contract], must be determined from the language of the [contract] alone.'" *Bourke*, 159 F.3d at 1036 (7th Cir. 1998) (quoting *Flora Bank & Trust* v. *Czyzewski*, 583 N.E.2d 720, 725 (Ill. App. Ct. 1991)). "[I]f the language of a contract appears to admit of only one interpretation, the case is indeed over." *AM Int'l Inc.* 44 F.3d at 574. In other words, "[i]n the absence of ambiguity, a court must construe a contract according to its own language, not according to the parties' subjective constructions." *William Blair & Co.* v. *FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334-335 (2005).

"'[A]n instrument is ambiguous only if the language used is reasonably or fairly susceptible to having more than one meaning.'" *Bourke*, 159 F.3d at 1036 (*quoting Flora Bank & Trust*, 583 N.E.2d at 720, 725 (Ill. App. Ct. 1991)). Thus, "[a] contract is not rendered ambiguous simply because the parties do not agree on the meaning of its terms." *Flora Bank & Trust*, 583 N.E.2d at 725. "Unless a contract clearly specifies its own meanings, a court must interpret the words of the contract with their common and generally accepted meanings." *William Blair & Co.*, 358 Ill. App. 3d at 334-335. Further, "a court must construe the words of a contract within the context of the contract as a whole." *Id.* If "one [party's] interpretation is reasonable and the other['s] is not, there is no ambiguity to resolve" and "the language of a contract . . . will be given its plain and ordinary meaning and enforced as written, without reference to extrinsic evidence." *Bourke*, 159 F.3d at 1036-1038; *Lakeview Collection, Inc.* v. *Bank of Am., N.A.*, 942 F. Supp. 2d 830, 842 (N.D. Ill. 2013); *see also Dawson* v. *Gen. Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992) (applying Illinois law) ("If an alleged written contract is unambiguous, the parties' intent is derived as a matter of law from the alleged contract itself.").

Conversely, "[i]f a contract is ambiguous, a court may then (and only then) consider extrinsic evidence to ascertain the parties' intent." *Pamado, Inc.* v. *Hedinger Brands, LLC*, 785 F. Supp. 2d 698, 706 (N.D. Ill. 2011). "The goal of the court in this situation is to determine what the parties mutually intended ambiguous language to mean." *Spring Air Co.* v. *Grand Rapids Bedding Co.*, No. 97 C 2050, 1998 U.S. Dist. LEXIS 5063, at *15 (N.D. Ill. Apr. 9, 1998). "When interpreting ambiguous language in a contract, courts should ... consider the 'surrounding circumstances at the time of the agreement and ... the interpretation which the parties themselves have placed on the agreement as shown by their contemporaneous or

subsequent acts or conduct.'" *Id.* at *15 n.6. "Courts will construe a contract reasonably to avoid absurd results." *Foxfield Realty* v. *Kubala*, 287 Ill. App. 3d 519, 524 (1997). Thus, "to the extent that a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Id.*

**2. The Language of Section 25.5.1.1 is Ambiguous**

As an initial matter, we find that the language of Section 25.5.1.1 of the Contract to be ambiguous as to the amount to be paid to Advatech in the event of a termination for convenience. Largely as a result of sloppy drafting in amending and updating the termination provision from cost reimbursable Amended Contract into the termination for convenience provision in the fixed price Second Amended Contract, and the attendant removal of certain defined terms from the provision as well as the imprecise mixing of defined terms and undefined phrases, the language of Section 25.5.1.1 is ambiguous.[29] More specifically, we find the language used in Section 25.5.1.1 is fairly susceptible of two reasonable meanings. We find that the calculation of the termination payment due to Advatech as set forth in Advatech's Statement of Claim and Mr. Nagorzanski's Expert Report at Section 4.2 is a reasonable interpretation of the language of Section 25.5.1.1. Likewise, we find that the calculation of the termination payment due to Advatech as set forth in the Lien Claim and as described more fully in Mr. Nagorzanski's Expert Report at Section 4.3 is also a reasonable interpretation of the language of Section 25.5.1.1.

[29] The negotiating history of the Contract as to the amount to be paid to Advatech in the event of a termination for convenience was the subject of the written witness statement testimony submitted by IPGC's in-house counsel David Sladic and Mr. Sladic's counterpart at Advatech, Christine Creammer. *See* Sladic Witness Statement at ¶¶ 7-39; C. Creammer Reply Witness Statement at ¶¶13-29. Portions of this negotiating history will be referenced later in this Interim Award.

**INTERIM AWARD: Advatech LLC v. Illinois Power Generating Company**

Conversely, for the reasons more fully discussed later in this award, we find that the interpretation proffered by IPGC is commercially unreasonable and is inconsistent with the plain

-13-

language of Section 25.5.1.1 and other provisions of the Second Amended Contract.[30] Our task is to ascertain the intent of the parties as between these two reasonable interpretations of Section 25.5.1.1 of the Contract.

### 3. Illinois Rules of Contract Construction

In their briefing, the parties each bring to the Tribunal's attention the well-recognized rule of contract construction under Illinois law that: "When a contract might allow different constructions, Illinois courts prefer the reading that is fair, customary, and such as prudent men would naturally execute."[31] The interpretation that yields a "reasonable, conventional type of agreement" is preferred.[32]

IPGC states that Illinois law is clear:

> to the extent that a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.[33]

---

[30] IPGC's position is concisely summarized in its Draft Partial Award (dated 11/19/2018) at p. 8, in which it states "The Fixed Price Contract is a payment schedule contract. IPGC's payment obligations were limited to specified annual amounts that were then broken down into monthly payments for each year. The payments were due only when and as scheduled. There is no dispute that IPGC has made every such payment." (citations omitted). The Tribunal expressly disagrees that the Second Amended Contract, a fixed price contract with a Contract Price of $433,298,890, is a "payment schedule contract." *See* Contract at Sec. 15.1. While the Payment Schedule sets forth the agreed timing of the $204,306,063 in payments to be made to Advatech for the performance of the remaining Work, the Contract, including Section 25.5.1.1 or Section 10.12 and Exhibit I-1, does not to limit the amount payable to Advatech in the event of a termination for convenience to the annual payment amounts set forth in the Payment Schedule. The parties specifically inserted the defined the term "Payment Schedule" into the Second Amended Contract, *see* Contract at Sec. 1.89, Sec. 10.12, and 17.1.1, to govern the timing of the payments to be made to Advatech, but did not use the term "Payment Schedule" in Section 25.5.1.1 of the Contract.

[31] *Bank of Commerce v. Hoffman*, 829 F.3d 542, 547-548 (7th Cir. 2016) (emphasis added). *See also*, *Countryman v. Indus. Comm'n*, 686 N.E.2d 61, 64 (Ill. App. 1997).

[32] *Trade Center, Inc. v. Dominick's Finer Foods, Inc.*, 711 N.E.2d 333 (Ill. App. 1st 1999) (emphasis added).

[33] IPGC Pre-Hearing Memorandum at 35, *citing Foxfield Realty v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. 2nd Dist. 1997) (emphasis added).

IPGC also notes that under Illinois law, "a contract should not be read to produce an interpretation that might fit the words, but make no commercial sense,"[34] and that where "there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided."[35] Finally, IPGC notes that "courts construe contracts so as to avoid absurd results."[36]

We will be guided by the foregoing settled rules of contract construction in determining the meaning of Section 25.5.1.1, particularly since both parties directed us to these Illinois rules of contract construction. We further note that Advatech is a sophisticated provider of engineering, procurement, and construction services, and that IPGC is a sophisticated consumer of engineering, procurement, and construction services.[37]

4. **Typical and Customary Method for Determining Payment at Termination**

As stated above, Illinois law favors a contract interpretation which is "fair" and "customary," and results in a "reasonable, conventional type of agreement." Advatech presented expert testimony from Ave Tucker to explain that Advatech's interpretation of Section 25.5.1.1 describes "a very commonly used approach in commercial construction termination provisions in the United States and internationally,"[38] because it "treats the contractor and the owner fairly."[39]

[34] IPGC Pre-Hearing Memorandum at 35-36, *citing Loop Paper Recycling, Inc.* v. *JC Horizon Ltd.*, No. 08 C 7364, 2010 U.S. Dist. LEXIS 40743, at *31 (N.D. Ill. Apr. 22, 2010).

[35] IPGC Pre-Hearing Memorandum at 36, *citing Baldwin Piano v. Deutsche Wurlitzer GmbH, 392 F.3d 881, 883 (7th Cir. 2004).*

[36] *Rubin* v. *Laser*, 301 Ill. App. 3d 60, 68 (1998). It is also noteworthy that IPGC goes to great lengths to in explaining Seventh Circuit and Illinois law on this point, *see* IPGC Pre-Hearing Memorandum at 35 – 39, and concludes by *citing Beanstalk Grp., Inc.* v. *AM Gen. Corp.*, 283 F.3d 856, 862 (7th Cir. 2002), for the proposition that "even if the language is clear, 'a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek'." *Id.* at 39. Further, at footnote 12, IPGC notes that "in the case of a commercial contract, one must have a general acquaintance with commercial practices." (citation omitted).

[37] Advatech expert witness Ave Tucker highlighted IPGC's sophistication. (Tucker Rebuttal Expert Report, para. 90-91.)

[38] Hearing Transcript, October 4, 2018, 1101:24-1102:5.

[39] Hearing Transcript, October 4, 2018, 1109:17-1110:10; *see also* Tucker Rebuttal Expert Report, para. 58.

The contractor is paid for the work the contractor has performed, including profit and fee based on the work actually done.[40] IPGC did not contest Mr. Tucker's opinions concerning common practice for determining the amount of the termination payment due to Contractor in the context of a termination for convenience.[41]

### 5. Circumstances at the Time the Parties Agreed to the Second Amended Contract

We find that it is appropriate under Illinois law to consider the commercial circumstances of the parties at the time of contracting when determining their intentions. Because Illinois follows the objective theory of contract intent, we do not consider the parties' unstated and unknown motivations.[42]

#### a. Contractual Background

As summarized briefly in footnote 1, Ameren and Advatech entered into the Initial Contract on January 1, 2011 for the design, engineering, procurement, construction, assembly, start-up and testing of the Project. The purpose of the Project was to bring the Plant into compliance with new sulfur dioxide emission standards that were set to become effective on January 1, 2015.[43] Under the Initial Contract, Final Completion of the Project was required by August 23, 2014. *Ex. C-2* at Ex. B. Ameren and Advatech executed the Amended Contract on August 22, 2011, setting forth an agreed-upon Target Cost Estimate ("TCE"). Both the Initial

[40] *Id.*

[41] To the contrary, IPGC states that the Contract, and its termination provision, are "anything but customary." IPGC Draft Award at 7. Accordingly, IPGC states that "the issue is not what is customary under other contracts, but rather what is provided for under this governing Contract." *Id.* However, as noted previously, Section 25.5.1.1 of this Contract is ambiguous, and therefore, as IPGC concedes, "to the extent that a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." IPGC Pre-Hearing Memorandum at 35, *citing Foxfield Realty v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. 2nd Dist. 1997) (emphasis added).

[42] *Laserage Tech. Corp. v. Laserage Lab*, 972 F.2d 799, 802 (7th Cir. 1992).

[43] *See* Mansker Witness Statement (3/19/2018) at ¶3.

Contract and Amended Contract were cost reimbursable, incentive contracts, with a shared cost savings provision.

In early 2012, Ameren began to pursue an extension from the Illinois Pollution Control Board on the emissions mandate that had created the need for the Project. Ameren and Advatech entered into the Deceleration Agreement, effective April 7, 2012, that slowed down the progress of the work based on fixed agreed-upon yearly billings. As previously stated, on December 2, 2013, IPGC acquired Ameren Energy Generating Company, and with it the Plant and the Project.

After the Illinois Pollution Control Board granted an extension for the emissions mandate deadline to 2020, IPGC requested a new estimate from Advatech that would extend the duration of the Project to this new deadline. Advatech provided an estimate on April 7, 2014 ("April 2014 Estimate") retaining the original contract type -- cost reimbursable, incentive contract, with a shared cost savings provision. Shortly thereafter, Advatech and IPGC entered into discussions to complete the Project under a fixed price contract. Advatech and IPGC ultimately executed the Second Amended Contract, effective December 15, 2014, with a Final Completion date of May 1, 2020. The Second Amended Contract converted the Amended Contract, a cost reimbursable, incentive contract, to a fixed price contract for the completion of the remainder of the Project.[44]

On February 12, 2016, Dynegy issued a Notice of Partial Suspension to Advatech, Ex. C-78, and, on September 2, 2016, Dynegy terminated for convenience Advatech's work pursuant to Section 25.5 of the Second Amended Contract.

**b. Project Financial Status at the Time of the April 2014 Estimate and the Fixed Price Offer**

[44] Much of this general contractual background is generally adapted from Tucker Rebuttal Report at pp. 1-2 and citations herein.

The April 2014 Estimate indicates Advatech estimated that, as of the date of the April 2014 Estimate, the Project would achieve $84.5 million of "Shared Savings," half of which Advatech would retain pursuant to the terms of the contract ($42.25 million). The April 2014 Estimate also indicated that Advatech expected to receive a fee of $38.7 million. Thus, Advatech would have made $81 million under the April 2014 Estimate.[45]

Shortly after Advatech provided the April 2014 Estimate, it provided IPGC with a fixed price offer of $216 million.[46] Ex. C-72. This offer increased the $189.8 million to-go completion cost in the April 2014 Estimate by $26.2 million, representing an additional risk premium to be paid to Advatech for accepting the risk of a fixed price, rather than cost-reimbursable, contract.[47] Consequently, at the time of these discussions, Advatech estimated that it would earn over $100 million at the completion of the Project.[48]

While this point should be clear from the Declaration Agreement and the requests made to the Illinois Pollution Control Board, we find that both parties knew well in advance of the negotiation of the Second Amended Contract that completion of this Project was far from a certainty. The parties knew that the power markets served by the Plant were depressed, and that

[45] *See* Tucker Rebuttal Expert Report at 18 and citations herein.

[46] Mr. Sladic stated that the amount to be paid under the Second Amended Contract was $204,306,063, and explained the difference between the $216 million offer and the $204,306,063 amount of additional payments to be made under the Contract as follows: "[the $204,306,063] price was lower than the $216.0 million quoted by Advatech in its April 15, 2014 offer to account for the payments that IPGC made to Advatech under the Deceleration Agreement in the seven months between the date of the offer (April 15, 2014) and the effective date of the Fixed Price Contract (December 15, 2014), as well as some minor price adjustments and an additional $2.5 million that we agreed would be included for certain warranty work." *See* Sladic Witness Statement at ¶16. Advatech did not contest this point.

[47] IPGC's allegations regarding Advatech's allegedly deceptive and/or misleading conduct are addressed later in this Interim Award.

[48] *See* Tucker Rebuttal Expert Report at 19 and citations therein. *See also* Greg Brown Initial Statement at para. 55-66 and 74 – 90.

the economic viability of the Project was in doubt. The completion date had been delayed by almost six years, and construction had been decelerated for two years.[49]

#### c. Section 15.1, Status of Payment and Status of the Completion, and the Payment Schedule

The Second Amended Contract, Section 15.1, provides:

> The price of the Work set forth in this Contract is $433,298,890 (the "Contract Price") and is not subject to change except pursuant to a mutually agreed upon Change Order or an Amendment to this Contract. $228,259,886 of the Contract Price has been paid as of November 11, 2014, $732,941 of the Contract Price remains to be invoiced and paid with respect to 2014.[50]

Subtracting the amounts paid and to be paid in respect of 2014 from the Contract Price of $433,298,890 confirms that Advatech was to be paid $204,306,063 to complete the remaining scope of the Second Amended Contract.[51] The amount Advatech was paid under cost reimbursable contracts through 2014 (as shown in Section 15.1 of the Second Amended Contract) was $228,992,827, or 52.8% of the Contract Price.[52] However, we find that the Work was at least 65.7% complete at contract conversion, based on Advatech's Monthly Report to IPGC for the period ending October 31, 2014.[53] This information was known to both parties prior to the execution of the Contract.

It is clear on its face that the payment schedule set forth in Exhibit I-1 was back-loaded such that the gap between the percent complete and the percent paid would not close until near

[49] *See* IPGC Pre-Hearing Memorandum at 1.
[50] Exhibit C-1, Second Amended Contract, Section 15.1.
[51] The Tribunal notes that the remaining amount to be paid to Advatech of $204,306,063 as implied from the December 15, 2014 Contract is representative of the firm price offer of $216,000,000 of April 15, 2014. *See* note 47 *supra*.
[52] Consistently, Contract Exhibit I-1 also shows that IPGC would pay 53% of the Contract Price at the end of 2014.
[53] Exhibit C-47, Monthly Report for period ending October 31, 2014, at p. 5, ADV0000096265. Monthly Reports were provided to IPGC. (Greg Smith Initial Statement, para. 51, 54). The October 2014 was the last before adjustments were made for contract conversion. (Greg Smith Initial Statement, para. 51.)

the end of the Project.[54] Further, Advatech expert Alan Nagorzanski persuasively explained the reasons that it would have been obvious to IPGC that the progress/payment gap would not close, including that (a) due to the proportionately less amount of work left, Advatech would not begin recover its deferred payments until 2018, and (b) Advatech's work schedule, Exhibit X, outpaced the Exhibit I-1 payment schedule.[55] IPGC did not present credible evidence rebutting Mr. Nagorzanski's conclusions.[56]

Further, it would have been obvious from comparing payments made to percent complete achieved that the gap was growing. It is not controverted that at the time of termination, Advatech had been paid the amount shown in Advatech's Final Invoice, $253,992,827.[57] That represents 58.6% of the Contract Price. However, by that time (according to Mr. Nagorzanski's calculation) the Project was 76.4% complete, leaving a payment gap of 17.8% versus a payment gap of less than 13% as of January 2, 2015.

## B. Amount of the Termination Payment Due to Advatech Pursuant to Section 25.5.1.1 of the Second Amended Contract

It is against the foregoing legal and factual backdrop that we consider the amount of the termination payment due to Advatech pursuant to Section 25.5.1.1 of the Contract.

### 1. Calculation of Termination Payment Due to Advatech

As set forth above, the Tribunal finds Section 25.5.1.1 ambiguous because it is fairly susceptible of two reasonable meanings. We find that the calculation of the termination payment

[54] *See* Al Nagorzanski Direct Examination PowerPoint, slides 31-32.

[55] A. Nagorzanski Direct Examination PowerPoint, slides 28-34; *See also* Hearing Transcript, October 3, 2018, 665:18-675:10.

[56] The Tribunal also notes that Advatech told IPGC during the contract negotiation period that the payment gap would grow over time. In a September 26, 2016 email to Mr. Mansker, IPGS's Mike Walker recounted from his notes a meeting with Advatech in the months before the Contract was effective. *See* Ex. C-202. Mr. Walker wrote, with respect to the Exhibit I-1 and I-2 schedules: "Advatech indicated during this meeting these numbers were created to match Dynegy cash flow but represented under billings for Advatech." *Id.*

[57] Exhibit C-6, September 30, 2016 letter to IPGC regarding Final Invoice.

due to Advatech as set forth in Advatech's Statement of Claim and Mr. Nagorzanski's Expert Report at Section 4.2 is a reasonable interpretation of the language of Section 25.5.1.1. Likewise, we find that the calculation of the termination payment due to Advatech as set forth in the Lien Claim and as described more fully in Mr. Nagorzanski's Expert Report at Section 4.3 is also a reasonable interpretation of the language of Section 25.5.1.1. Our task is to ascertain the intent of the parties as between these two reasonable interpretations of Section 25.5.1.1 of the Contract, in light of the language of the Contract, the foregoing rules of construction, the typical and customary method for determining termination payments, and the circumstances existing at the time of the Contract.

We find that the appropriate calculation to be utilized pursuant to Section 25.5.1.1 of the Second Amended Contract is the following:

**[(cost to IPGC of remaining Work) *multiplied by* (% complete of remaining Project at termination)] *less* (payments under Contract) *EQUALS* Termination Payment**

Based upon the evidence summarized at Sections 4.3.2 to 4.3.4 of Mr. Nagorzanski's Expert Report,[58] and the additional evidence presented in this matter, we calculate the termination payment due to Advatech from IPGC as follows:

**($204,306,063 x 30.266%) – $25,000,000 = $36,835,273**

As discussed above, it is uncontested that IPGC paid Advatech $33,333 as a termination payment, and that IPGC is entitled to a credit in this amount. Therefore, the remaining amount of the termination payment due to Advatech from IPGC is $36,801,940.

## 2. Analysis of Section 25.5.1.1 and the Parties' Stated Intentions

[58] The calculations set forth in the Mechanic's Lien and as set forth at Sections 4.3.2 to 4.3.4 of Mr. Nagorzanski's Expert Report are premised upon an overall project completion percentage of 77.7%. As set forth above, we find that the most appropriate percent complete for the Project at the time of termination is 76.43%. Accordingly, we have adjusted the percentage of the completion of the work remaining after the Second Amended Contract from 34.023% (11.5%/33.8%) to 30.266% (10.235%/33.8%).

We find that the interpretation of Section 25.5.1.1 used by Advatech in the Mechanic's Lien is consistent with the intention of the parties, the foregoing Illinois rules of contract construction, the typical and customary method for determining termination payments, and the circumstances existing at the time of the Contract.

**a. The "cost of the Work"**

None of the witnesses proffered a reasonable explanation for the use of the term "cost of the Work" in Section 25.5.1.1 of the Second Amended Contract.[59] However, while we note that while "Work" is a defined term in the Contract meaning "all of the services . . . as set forth in the Project Specifications and the Contract Documents,"[60] Section 25.5.1.1 does not use the term "Contract Price," which is defined in Section 15.1 to be $433,298,890. The parties used the undefined phrase "cost of the Work," which strongly implies that "cost of the Work" has a different meaning than "Contract Price" or than the previously defined term "Cost of the Work." We find that the failure to use the defined term "Contract Price" in Section 25.5.1.1 means that the parties did not intend for "Contract Price" to be used in the calculation. *See Air Line Stewards & Stewardesses Ass'n, Local 550* v. *Am. Airlines, Inc.*, 763 F.2d 875, 883 (7th Cir. 1985) (refusing to give the phrase "length of service" in a contract the same meaning as the defined term "Credited Service" because the defined term "conspicuously [did] not appear in" the provision at issue); *Taracorp, Inc.* v. *NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) ("[W]hen parties to the same contract use such different language to address parallel issues . . . it

[59] "Cost of the Work" was a defined term in the Amended Contract. *See* Section 1.25. However, during the negotiation of the Second Amended Contract, the parties deleted the defined term "Cost of the Work" and used the term "cost of the Work." "cost" has no meaning under the IPGC $500,000 monthly payment/30 days per month = $16,667 daily rate interpretation of Section 25.5.1.1. Further, once the Contract was executed, the distinction between cost and profit melted away and the only the percent complete and price mattered.

[60] Exhibit R-1, Second Amended Contract, Section 1.139.

is reasonable to infer that they intend this language to mean different things.") (applying Illinois law).

For the foregoing reasons, we conclude the parties intended "cost of the Work" to mean the amount to be paid by IPGC for the remaining work to be performed under the Second Amended Contract -- $204,306,063. *See* Contract at Section 15.1[61]. The is most reasonable interpretation of "cost of the Work" within the context of this fixed price contract is the Owner's cost to complete the Work to be performed after the Effective Date of the Contract.[62]

**b. "percent complete of the Project from the last scheduled payment to the date of termination"**

IPGC proposes an interpretation of "the cost of the Work performed based on the percent complete of the Project from the last scheduled payment to the date of termination" that would apply only to those days worked during the month of termination. This calculation is not consistent with manner in which the Project was implemented, particularly given the lack of specific progress to be achieved in a month against which to apply the percentage. In other words, the parties did not establish how much progress was to be accomplished in any month. Therefore, there is no "as planned" value from which to compare the extent to which progress (percent complete) was achieved during the month of termination.

This is illustrated by what IPGC was forced to do to a avoid this problem. IPGC applied the percent complete against the $500,000 payment due for September 2016. The $500,000 payment is not representative of any specific progress to be achieved in September of 2016; rather, it is an arithmetic sum which represents the payment to be made for a duration of time.

[61] This interpretation is entirely consistent with the commercial reality that the Second Amended Contract converted the Amended Contract, a cost reimbursable, incentive contract, to a fixed price contract for the remainder of the Project, and specifically included the quantification of the amounts paid under the prior contracts in Section 15.1.

[62] As pointed out by IPGC, the $204 million amount is the "contract price" reflected on each of Advatech's payment applications prior to its last invoice. *See* IPGC Draft Award at 20, *citing* R-182 at, *e.g.*, ADV0000226650, 258107, 181056, 177571, 148386, 148506, and 624372 (Contractor's Affidavits For Progress Payment).

One cannot apply a percent complete against a time duration; one can only calculate a percent of the duration which has elapsed. Consequently, IPGC is calculating the amount due by measuring the number of days which had elapsed (2) of the total 30 days in September. This is not a percent complete calculation, and is only tangentially related, if at all, to the amount of progress achieved during a period of time. IPGC claims that it adopted this method because it did not have the data to do otherwise. We find even if it had the data, it still not logical to apply percent complete to a period for which the parties did not establish an expected degree of completion to occur. An outcome based on two calendar days does not yield a rational result.

Further, as set forth fully above, Section 25.5.1.1 of the Contract is ambiguous, and therefore, as IPGC concedes, "to the extent that a contract is susceptible of two interpretations, one of which makes it <u>fair, customary, and such as prudent persons would naturally execute</u>, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." IPGC Pre-Hearing Memorandum at 35, *citing Foxfield Realty v. Kubala*, 678 N.E.2d 1060, 1063 (Ill. App. 2nd Dist. 1997) (emphasis added). The calculation that we have set forth in detail above is reasonable, and is fair, customary and such as prudent persons would naturally execute. It is consistent with the negotiating history, and it gives effect to Section 15.1, Section 25.5.1.1, and the other relevant terms of the Contract. IPGC's interpretation of "percent complete of the Project from the last scheduled payment to the date of termination," which calculates the amount of the termination payment by dividing the number of days which had elapsed during a month by the total number of days in the month, and multiplying that quotient by a monthly payment amount, is highly unusual and is not a method that reasonable persons

would normally and customarily use to determine the termination payment in the context of a fixed price contract.[63]

Furthermore, IPGC's interpretation wholly ignores the "percent complete of the Project," irrespective of whether one measures the commencement from the execution of the Initial Contract or from the execution of the Second Amended Contract. As testified to at length by Mr. Tucker, the percent complete methodology, in addition to being specifically set forth in Section 25.5.1.1, is commonly and ordinarily used in commercial construction as the measure of a termination payment. It is a methodology that is fair, customary, and such as prudent persons would naturally execute.

Given that we have found the "cost of the Work" to mean the Owner's cost to complete the Work to be performed after the Effective Date of the Contract, Advatech's application of percent complete against the entirety of the expected performance (100% complete) likewise cannot logically be applied.

As set forth above, we have found as a factual matter that the amount Advatech was paid under cost reimbursable contracts for Work performed through 2014 (as shown in Section 15.1 of the Second Amended Contract) was $228,992,827, or 52.8% of the Contract Price. Further, we found that the Work was at least 65.7% complete at contract conversion, based on Advatech's Monthly Report to IPGC for the period ending October 31, 2014. We also found that the percent complete of the Project was known to both parties prior to the execution of the Contract. This difference between the percentage complete of the Project and amounts paid

[63] IPGC's interpretation is based upon the conclusion that the Second Amended Contract is a "payment schedule contract." The Tribunal expressly requests this conclusion for the reasons set forth above, including but not limited to those discussed in footnote 30 *supra*.

toward the Contract Price created what the parties referred to as a "gap" whereby Advatech would receive $204 million for completing the remaining approximately 34% of the Project.

We do not find it to be a reasonable interpretation of Section 25.5.1.1 that Advatech would be entitled to receive a termination payment of approximately $80 million if IPGC unilaterally decided to terminate the Second Amended Contract for its convenience shortly after its Effective Date. The parties executed the Second Amended Contract effective December 15, 2014, each with knowledge that Advatech had been paid $228,992,827, or 52.8% of the Contract Price, and that Advatech had completed more than 65% of the Work completed through the Effective Date. It is clear the face of the Payment Schedule that the timing of payments was back-loaded such that the gap between the percent complete and the percent paid would not close until near the end of the Project. It is equally evident that each party had knowledge of the market conditions, and the possibility that the Project may be aborted prior to completion.

Accordingly, the use of the phrase "percent complete of the Project" is reasonably and logically interpreted to mean the percentage complete of the Work remaining to be performed after the Effective Date of the Contract, which is precisely the interpretation used by Advatech in its Mechanic's Lien. Therefore, "percent complete of the Project," in our view and based upon the evidence presented, refers to the percentage completed as of termination of the remaining Work to be performed under the Contract, which is consistent with the language "cost of the Work" (discussed above) and "less all prior payments" (discussed below), and which yields a reasonable and logical interpretation of Section 25.5.1.1.

**c. "less all prior payments"**

We find that the phrase "less all prior payments" means all payments made under the Second Amended Contract. The phrase does not use any defined or unusual words, and its contribution to the formula is to provide a credit for the payments to be made by IPGC after the

Effective Date of the Contract from the amount of compensation Advatech would be due at the time of termination.

IPGC's contract negotiator, David Sladic, testified that "less all prior payments" refers to a payment made between August 31, 2016 and September 1 [presumably meant to be September 2] 2016 for work done during that time.[64] This interpretation is inconsistent with the invoicing and payment practices on the Project. Under the Second Amended Contract, Advatech invoiced in arrears for the previous month's work.[65]

At the hearing, Mr. Sladic attempted to explain how "less all prior payments" could mean a payment made during September 1-2 for work performed during that period. However, the evolution of his testimony suggests a retrospective creation of IPGC's contracting intent. First, in his initial witness statement, Mr. Sladic testified that he inserted the phase "less all prior payments" into the draft Section 25.5.1 "to confirm that Advatech would not be entitled to compensation for the work that was completed between the last scheduled payment and the date of termination in the event that Advatech had already received payment for that work."[66] In his rebuttal witness statement, Mr. Sladic changed his reasoning, testifying: "I wanted to safeguard IPGC's right to credit for any potential excess payments that IPGC could have made (e.g. back charges), through Project completion."[67] At the arbitral hearing, Mr. Sladic explained the change as follows:

> Q: Next sentence, "I wanted to safeguard IPGC's right to credit for any potential excess payments that IPGC could have made,

[64] Hearing Transcript, October 4, 2018, 1207: 6-17.

[65] Hearing Transcript October 2, 2018, 307:11-308:2; Hearing Transcript, October 3, 2018, 883:20 – 844:21. Under Section 17.2 of the cost-reimbursable Amended Contract, Advatech was to submit "Advanced Payment Invoices," which would be trued-up when actual costs were known. That provision was deleted in the contract conversion process, and Section 17.1 of the Second Amended Contract provides instead for monthly payments to be made on a net-30 day basis.

[66] Initial Witness Statement of David Sladic, para. 35.

[67] Rebuttal Witness Statement of David Sladic, para. 9.

> backcharges, through projection completion." Now, this appeared in your second statement because it—in your second statement because between the time you authored the first statement and when you authored the second statement you saw the testimony of Mr. Smith who called to your attention that the statement made in your first statement could not occur under the contract, isn't that right?
>
> A: Yes.
>
> Q: Okay. So you came up with yet another reason why "less all prior payments" could possibly refer to something in the period between August 31 and September 1st, and what you chose here was back-charges. Right?
>
> A: Yes.[68]

We do not find the testimony of Mr. Sladic's to be credible on this point.[69]

Likewise, Advatech's interpretation of the phrase "less all prior payments" is not supported by the language of Section 15.1 of the Contract. The final sentence of Section 15.1 sets forth the amount of the Contract Price that has been paid as of November 11, 2014, and the amount of the Contract Price remaining to be invoiced and paid with respect to 2014. In this section, the parties recognize that these amounts have been or will be paid for work through 2014, and that these amounts are part of the Contract Price. However, the parties used the phrase "cost of the Work" in Section 25.5.1.1, rather than the defined term Contract Price, which reasonably and logically means IPGC's cost to complete the Work remaining to be performed under the Second Amended Contract.[70]

---

[68] Hearing Transcript, October 4, 2018, 1215:7-1216:1.

[69] We also not that Mr. Sladic does not recall communicating with Advatech concerning this phrase. Hearing Transcript, October 4, 2018, 1220:12-17.

[70] This point has been addressed earlier in this Interim Award and will not be further addressed here.

Thus, we conclude that the phrase "less all prior payments" means the payments made by IPGC to Advatech for the Work performed under the Second Amended Contract. The parties agree that the amount paid under the Second Amended Contract is $25,000,000.[71]

**d. Conclusion**

We find the undefined phrase "cost of the Work" as used in Section 25.5.1.1 to mean the Owner's cost to complete the Work to be performed under the Second Amended Contract. We find the phrase "percent complete of the Project" to mean the percentage complete of the Project remaining to be performed under the Second Amended Contract. Finally, we conclude that the phrase "less all prior payments" means the payments made by IPGC to Advatech under the Second Amended Contract. Therefore, we find that the parties' intentions are met by the following formula for determining the cancelation payment, pursuant to which we calculate the termination payment due to Advatech from IPGC as follows:

**($204,306,063 x 30.266%) – $25,000,000 = $36,835,273**

**C. <u>Other Issues Raised by the Parties</u>**

**1. <u>Second Amended Contract Section 25.5.2</u>**

IPGC contends that Advatech's claim is inconsistent with Contract Section 25.5.2.[72] We disagree; the provisions can readily be interpreted so as to give Section 25.5.1.1 its intended meaning. Section 25.5.2 provides in its entirety:

> A written statement from Contractor setting forth a full and detailed account of the nature and dollar value of the Work performed to the date of termination for which it is requesting payment, with appropriate supporting invoices, bills and other

[71] The $25,000,000 in payments under the Contract excludes IPGC's termination payment of $33,333 and its payment of demobilization costs of $519,301.
[72] IPGC's Pre-Hearing Memorandum pp. 33-34.

> documentation necessary to evaluate and substantiate the payment to Contractor, including documentation set forth in Article 17.[73]

Section 25.5.2 is not a complete sentence, and some context is needed to understand its meaning. Section 25.5.2 appears after 25.5.1.1, which provides for the termination payment discussed above, and 25.5.1.2, which provides for Advatech's recovery of demobilization costs.

IPGC contends that Advatech did not submit documentary backup for its costs through termination, as required by Section 25.5.2.[74] IPGC is linking 25.5.2 to 25.5.1.1, but such a linkage is inconsistent with IPGC's interpretation of 25.5.1.1. Indeed, neither party suggests that the termination payment should be based on Advatech's actual costs up to termination: Advatech uses a percentage of the agreed fixed price and IPGC uses the Exhibit I-1 and I-2 payment schedules. Consequently, it would be illogical for Section 25.5.2 to require that Advatech submit backup for its actual costs on a fixed priced contract which IPGC contends is otherwise governed by the payment schedule.

Section 25.5.1.2 provides for the recovery of "reasonable, actual, direct costs incurred by Contractor."[75] Consequently, it is reasonable and logical that that Section 25.2.2 relates to the documentary back-up required for reimbursement of demobilization costs. We also note that IPGC presented no testimony that Advatech's request for its termination payment was denied on the grounds of a lack of supporting documentation, particularly since it paid Advatech a $33,333 invoice based upon its own determination of the Contract and without requesting any supporting documentary back-up as a condition to payment.

### 2. <u>Second Amended Contract Section 25.7</u>

[73] Exhibit R-1, Second Amended Contract. Section 25.5.2 is nearly identical to Section 26.6.2.4, which requires a written statement in the event of termination for default, and which is carried forward in Section 25.6 from Section 26.6.4.2 of the cost-reimbursable Amended Contract.

[74] IPGC's Pre-Hearing Memorandum, pp. 33-34.

[75] The parties have consistently referred to these costs as demobilization costs. *See* Section II.D of this Interim Award.

Second Amended Contract Section 25.7 provides:

> Work Not Performed. In no event (whether Owner terminates for its convenience or for cause) shall Owner be responsible for costs that Contractor would have earned if it had completed the Work.[76]

IPGC contends that Section 25.7 is consistent with its reading of Section 25.5.1.1.[77] We find that Section 25.7 relates to future costs, and that Advatech is not seeking to recover amounts that it would have earned had the Project not been terminated. Since Advatech's payment at termination relates to the portion of remaining Work performed, IPGC is not paying for Work not performed as a result of the termination. We presume the parties did not intend for Sections 25.5.1.1 and 25.7 to be in conflict, and we find that Sections 25.5.1.1 and 25.7 are not in conflict.

3. **Unreasonable Profit / Unenforceable Penalty**

IPGC contends that Advatech's interpretation of Section 25.5.1.1 would result in an "absurd" termination payment, which should be avoided.[78] Going further, IPGC contends that Advatech's interpretation of Section 25.5.1.1 would render the provision an unenforceable penalty.[79] We presume that IPGC is not asking us to find that it generally would be absurd for a contractor upon termination to be paid a percentage of its lump-sum price commensurate with its work, as that is commonplace. We therefore understand that IPGC essentially asks us to find that the Owner's cost to complete the Work under the Second Amended Contract – the agreed amount of $204,306,063 - is unenforceable. Advatech is a sophisticated provider of engineering, procurement, and construction services, and that IPGC is a sophisticated consumer of engineering, procurement, and construction services. They agreed on the Contract Price, including Owner's cost to complete the remaining work at the time of the Second Amended

[76] Exhibit C-1, Second Amended Contract Section 25.7.
[77] IPGC's Rebuttal Pre-Hearing Memorandum, p. 24.
[78] IPGC's Pre-Hearing Memorandum, p. 35-36.
[79] IPGC's Pre-Hearing Memorandum, pp. 46-49.

Contract. We do not intend to second-guess an agreed price reached between two highly sophisticated commercial parties, each represented throughout by legal counsel.

Mr. Mansker testified that when he looked at the Contract he was negotiating and its fixed price, he "used the experience we had building four scrubbers prior to this and comparing the overall cost that we experienced to what the cost would be here."[80] Based on that experience, he thought the Contract Price of $433 million was an acceptable number.[81] Mr. Mansker testified at length on cross-examination regarding his wealth of experience in project management, including FGD projects.[82] Mr. Mansker accepted Advatech's fixed price offer without providing a counter-offer.[83]

Additionally, as discussed above, IPGC knew or should have known at the time of the Second Amended Contract that Advatech estimated a profit in excess of $100 million, or approximately 25% of the Contract Price. Two entities with deep experience implementing improvements to power plants agreed to the Contract Price, and we do not find their bargain unreasonable. Further, determining the amount of a termination for convenience payment based upon the proportion of the work completed is reasonable, normal and customary.[84]

4. **Alleged Deceptive Conduct**

IPGC asserts that Advatech engaged in a variety of misleading conduct, some of which is temporally related to the Second Amended Contract negotiations and some is not, that allegedly

[80] Hearing transcript, October 4, 2018, 1312:4-20.
[81] Hearing transcript, October 4, 2018, 1312:14-20.
[82] Hearing Transcript, October 4, 2018, 1273:14-1292:11. Further, the evidence presented on what IPGC considered to be a reasonable price suggests that Advatech's offer was less than IPGC's internal going-forward estimate. Advatech's April 7, 2014 re-estimate referred to an internal IPGC going-forward estimate of $226.0 million (Exhibit C-21). IPGC's internal May 21, 2014 "Newton Scrubber NPV analysis" refers to a "DYN Capital Plan" of $274.4 million. (Exhibit C-187.)
[83] Greg Brown Reply Witness Statement, para. 38.
[84] Tucker Rebuttal Expert Report at 18; Tucker PowerPoint at 2, 17.

induced IPGC to agree to the Second Amended Contract.[85]

IPGC contends that Advatech's alleged bad conduct[86] is relevant for four reasons: (a) because Advatech hid its intent there could be no meeting of the minds, (b) because Advatech hid its intent Advatech's interpretation of the Contract should be rejected, (c) Advatech's scheme demonstrates why its interpretation of the Contract is commercially unreasonable, and (d) Advatech's conduct explains the origin of the large termination payment requested.[87] We find that Advatech did not act deceptively, did not engage in fraud, and did not make any actionable intentional or negligent misrepresentations.

**a. 2011 Target Cost Estimate**

IPGC contends that Advatech, while working under the Initial Contract in 2011, provided IPGC (then known as Ameren) with an intentionally overstated target cost estimate ("TCE") so that Advatech could more readily underrun the budget and reap more Shared Savings.[88] We find that IPGC did not prove that the TCE was improperly inflated, or that if it were that had any bearing on IPGC's agreement to the Second Amended Contract.

IPGC's criticisms of the TCE was presented entirely through the expert opinions of Frank Regnery, without support from involved fact witnesses. Among other things, Mr. Regnery in his initial report provided four examples of line items from the TCE that he contended suffered from double-counting and other problems.[89] In response, Greg Smith, who was involved in creating the TCE, rebutted the factual predicate for each of Mr. Regnery's criticisms.[90] Expert witness Ave Tucker explained that Mr. Regnery's criticisms arose out misunderstandings of the

[85] *See e.g.* IPGC's Pre-Hearing Memorandum, p. 4-6, 11-16.
[86] IPGC has not asked the Tribunal to rescind the Contract. To the contrary, IPGC asks the Tribunal to enforce the Contract in accordance with IPGC's interpretation of its terms.
[87] IPGC's Rebuttal Pre-Hearing Memorandum, p. 7.
[88] IPGC's Pre-Hearing Memorandum, p. 4-5.
[89] Regnery First Report, para. 60-72.
[90] Hearing Transcript, October 2, 2018, 290:20-305:15.

estimate.[91] IPGC presented no credible evidence that Messrs. Tucker and Smith were incorrect. In his second expert report, Mr. Regnery compared 18 control accounts from the TCE estimate to estimated amounts Mr. Regnery derived using published estimating references.[92] Al Nagorzanski, testifying on behalf of Advatech, explained the unrepresentative nature of Mr. Regnery's sampling, and challenged Mr. Regnery's estimates.[93]

Further, the evidentiary record shows that IPGC (then Ameren) approved the TCE estimate only after an effort to "[t]horoughly review the proposed Target Cost Estimate in an effort to validate estimated costs," as described by Ameren's Duane Harley in a June 30, 2011 email and memorandum.[94] That review included verifying labor payment rates, and also that labor productivity rates were in line with Illinois labor expectations.[95] IPGC also compared the TCE to industry averages and found that "[t]he project cost estimate is below current market estimates < $300/kw."[96]

Considering the totality of the opinion and fact evidence presented, we are not persuaded that Advatech improperly inflated the TCE. And if it had, IPGC has not established that it relied on the TCE in agreeing to the Second Amended Contract. In its April 7, 2014 letter providing the re-estimate to 2020, Advatech advised IPGC of its actual costs to date and the $84.5 million amount of its project-wide Shared Savings.[97] That was ample notice that Advatech was substantially underrunning the Project budget, regardless of what the TCE stated. Further, the only representative of IPGC management to appear at the hearing, Mr. Mansker, testified he

[91] Ave Tucker Direct Exam PowerPoint, slides 53-63; Hearing Transcript, October 4, 2018, 1132:22-1142:16.
[92] Regnery Second Report, para. 39-46
[93] Al Nagorzanski direct testimony PowerPoint, Slides 47-95. Hearing Transcript October 4, 2018 693:10-725:10.
[94] Exhibit C-147.
[95] *Id.*
[96] *Id.*
[97] Exhibit C-21, email from Greg Smith enclosing Advatech's re-estimate.

could not remember whether or not he received the entire TCE estimate,[98] he did not thoroughly review the TCE,[99] and he did not review the TCE estimate in preparing for and negotiating the Second Amended Contract.[100]

**b. Shared Savings Accumulated During Deceleration**

IPGC contends that Advatech hid the fact that it was accumulating additional Shared Savings during the Deceleration Period and schemed to keep all of the undisclosed savings to itself by converting the cost-reimbursable Amended Contract to a fixed price.[101] We do not find a deceptive scheme to hide information concerning savings based on the evidence presented. It was IPGC (then Ameren) that in the Deceleration Agreement directed Advatech to discontinue reporting the accumulation of Shared Savings.[102] IPGC presented no evidence as to why it directed Advatech to cease reporting contingency. IPGC nevertheless apparently was aware of the savings, as Mr. Walker's September 26, 2016 email explained: "Advatech's construction scheduled tasks consistently came in under the scheduled man hours estimated."[103]

Moreover, the evidence clearly established that Advatech disclosed the Shared Savings information to IPGC *before* Advatech submitted its fixed-price offer, and long before the parties agreed to the Second Amended Contract. In its April 7, 2014 letter, Advatech set forth its estimated $84.5 million in Shared Savings, in boldface, and attached a spreadsheet that broke out the individual line items enjoying Potential Shared Savings and provided a great deal of

[98] Hearing Transcript, October 4, 2018, 1308:8 to 1309:7.
[99] Hearing Transcript, October 4, 2018, 1311:1-8.
[100] Hearing Transcript, October 4, 2018, 1309:15-21.
[101] IPGC's Pre-Hearing Memorandum, pp. 10-12.
[102] Section 1.2 of the Deceleration Agreement provided that Advatech's "Monthly Reports shall exclude the following items: . . . Source and Use of General Contingency." (Exhibit C-4.) Advatech's vehicle for reporting the accumulation of Shared Savings had been the General Contingency Logs in the Monthly Reports. (Greg Smith Initial Statement, para. 43, 53, 75.)
[103] Exhibit C-202.

information about the magnitude and nature of those cost savings.[104] These disclosures fatally undermine IPGC's contention.

#### c. IPGC's Consideration of Identified Risks and the $84 Million in Estimated Savings

IPGC contends that Advatech's April 7 and 15, 2014 letters to IPGC emphasized the risks of extending the Project completion into 2020, which duped IPGC into accepting Advatech's fixed-price offer.[105] To support this notion, IPGC included in Mr. Mansker's witness statement that he considered the $84.5 million in savings to be costs.[106]

We find Mr. Mansker's testimony that $84.5 million in savings would be costs going forward to be not credible within the context of this Project and circumstances under which the negotiation of the Second Amended Contract were conducted. A conclusion that $84.5 million in savings would become costs requires the presumption that a successful project which was two-thirds complete would abruptly change course and need to deplete $84.5 million in contingency while completing the last $115 million worth of work remaining.[107] Further, Mr. Mansker could only have based such a conclusion on hunches, because he testified that he never asked Advatech to quantify the risks stated in the letters, and he never quantified them himself.[108] IPGC has not come forth with any contemporaneous written analysis of the risks stated in the letter. At the arbitral hearing, IPGC expert Frank Regnery supported the reasonableness of Mr. Mansker's professed conclusion, only after several attempts to avoid the issue:

[104] Exhibit C-21, April 7, 2014 email from Greg Smith enclosing Advatech's re-estimate. See A. Tucker Direct Examination PowerPoint, slides 9-12, 31-36; Hearing Testimony, October 4, 2018, 1105:14-1106.14; 1118:17-1124:14.
[105] IPGC's Pre-Hearing Memorandum, p. 14-15.
[106] Joseph Mansker Initial Witness Statement, para. 16.
[107] See Ave Tucker Direct Exam PowerPoint, slide 26-27. Hearing Transcript, October 4, 2018, 1117:1-15.
[108] Hearing Transcript, October 5, 1358:14-1359:9.

> Q: One more time. Is it your position that savings in a cost reimbursable contract are not—if they're not guaranteed, they should be considered costs?
>
> A: Yes.[109]

We do not find Mr. Regnery's testimony on that point to be credible.

Finally, IPGC did not establish that whatever thoughts Mr. Mansker's may have had drove IPGC's decision-making. Mr. Mansker does not recall whether he communicated his thoughts about discounting the $84.5 million to IPGC management, and he believes no documentation exists of his assumptions about the risks in a report to management about the lump sum proposal.[110] The one document in evidence showing IPGC's consideration of Advatech's 2020 re-estimate—IPGC's internal May 21, 2014 "Newton Scrubber NPV analysis"—refers to Advatech's $190.7 million going-forward estimate without any reduction for risk.[111]

In any event, IPGC has not provided a credible basis for the Tribunal to conclude that Advatech's statements concerning risk were false in the first place. The authors of the letters testified that they believed their statements, and IPGC has not credibly demonstrated to the contrary.[112] Indeed, Mr. Mansker testified in general agreement with the risks identified.[113] IPGC argues that the characterization of the risk was inconsistent with Advatech's reduction of its contingency/escalation account to $9.5 million just after the Second Amended Contract was signed.[114] We do not find such actions inconsistent with the April 2014 letters, as the letters did

---

[109] Hearing Transcript, October 5, 1451:9-1454:8.
[110] Hearing Transcript, October 5, 2016, 1347:23-1348:7; 1359:1-9.
[111] Exhibit C-187, May 21, 2014 email from K. Truesdel to J. Mansker, attached spreadsheet Tab "Mansker detail." Hearing Transcript, October 5, 2018, 1349:15-1355:3.
[112] Greg Smith Reply Witness Statement para. 18-20; Greg Brown Reply Witness Statement para. 49-52.
[113] Hearing Transcript, October 4, 2018, 1249:20-1252:22.
[114] IPGC's Pre-Hearing Memorandum, p. 15; Greg Smith Initial Statement, para. 128.

not quantify the risk, and that it was unreasonable to assume that $84.5 million in savings would become costs, contrary to the testimony of Mr. Mansker.

In furtherance of its claim that it was duped by the April 2014 letters, IPGC contends that (a) the April 7, 2014 re-estimate was intentionally structured to be impenetrable, (b) information was removed from the spreadsheet attached to the letter, and (c) Advatech used the confusing term "Partial Future Savings."[115] IPGC again relies on the testimony of Mr. Mansker, but he clearly delegated the analysis of the 2020 re-estimate to his project manager at the site, Mike Walker, who did not testify. Mr. Mansker testified that he read the 2020 re-estimate cover letter but he only "briefly looked at the attached information [in the spreadsheet], which was obviously a lot."[116] Mr. Mansker did not have the time to take a detailed look at the estimate, and asked Mr. Walker to do so.[117] Mr. Walker identified questions he had regarding the estimate, and he and Mr. Mansker met with Mr. Smith to go through Mr. Walker's questions.[118] They were not constrained in the questions he could ask Mr. Smith.[119] We do not know what Mr. Walker understood about the estimate and Shared Savings because he did not testify in these proceedings. We also do not know what the persons at IPGC who made the decision to accept the fixed-price offer thought about the estimate, but it is clear from his testimony that Mr. Mansker was not in a position to fully brief them on these issues.[120] We cannot on this record determine that there was anything misleading, confusing, or objectionable about the 2020 re-estimate.

[115] IPGC's Pre-Hearing Memorandum, pp. 13-14.

[116] Hearing Transcript, October 4, 2018, 1243:2-13.

[117] Hearing Transcript, October 4, 2018, 1243:8-1244:2.

[118] Hearing Transcript, October 4, 2018, 1245:1-10; October 5, 2018, 1334: 15-1335:21.

[119] *Id.*

[120] Our ability to determine what IPGC understood based on Advatech's statements was diminished by the lack of testimony from Mr. Walker, who played a central role in the matters at issue in IPGC's defenses, and the limited memory of Mr. Mansker on many of the issues upon which he was called to testify.

**d. Amount of April 7, 2014 Re-Estimate for a 2020 Project Completion**

IPGC presented the expert opinions of Frank Regnery to suggest that Advatech's $190.7 million going-forward 2020 re-estimate was inflated. Mr. Regnery identified a total reduction of $17.5 million in 31 selected accounts between Advatech's April 7, 2014 re-estimate and a May 2015 budget which Advatech prepared after a re-baselining exercise after contract conversion.[121] However, Mr. Regnery did not perform any analysis of the circumstances or the difference in the estimating assumptions for any selected account.

Mr. Regnery's analysis hinges on the assumption that Advatech had identical knowledge and considerations at the end of January 2014 (the data date for the April 7, 2014 re-estimate)[122] as it had when it generated the May 2015 job cost report. Mr. Regnery did not compare what the estimators could have foreseen in May 2015 as opposed to January 2014. We found persuasive the testimony of Advatech's Greg Smith that events occurring after January 2014 explained the reductions in estimated costs of specific work items adding up to many millions of dollars.[123] Mr. Smith's testimony was consistent with the history of the Project, which was one of actual costs underrunning estimated costs throughout the Project.

Based on the evidence presented, we cannot conclude that Advatech improperly inflated the 2020 re-estimate. Further, we cannot surmise what IPGC would have done if the 2020 re-estimate had been $17 million higher, as Mr. Regnery opines it should have been.

Therefore, for the foregoing reasons, we find that Advatech did not act deceptively, did not engage in fraud, and did not make any actionable intentional or negligent misrepresentations upon which IPGC reasonably relied.

[121] Regnery First Expert Report, para. 113-116, Appendix 8.
[122] Exhibit C-21, April 7, 2014 email from G. Smith enclosing the 2020 re-estimate.
[123] Hearing Transcript, October 5, 2018, 1507:5-1529:20.

## IV. INTEREST, LEGAL FEES AND COSTS

### A. Interest

Advatech seeks pre-judgment interest pursuant to 815 ILCS 205/2, which provides in relevant part: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any . . . instrument of writing."[124] Advatech contends that the amounts it is owed are liquidated or subject to easy computation, and therefore recoverable under Illinois law.[125]

IPGC does not contest that, in appropriate cases, 815 ILCS 205/2 provides for 5% simple pre-judgment interest through the date of award.[126] However, IPGC contends that pre-award interest is only appropriate where the amount due under a contract is "liquidated or subject to exact computation, " *citing Ouwenga* v. *Nu-Way Ag, Inc.*, 239 Ill. App. 3d 518, 527 (1992).[127]

As recognized by IPGC, Rule 48(d)(i) of the AAA Construction Rules expressly authorizes the Tribunal to award interest "at such rate and from such date as the Tribunal may deem appropriate." Based upon the foregoing, we find it to be appropriate to award pre-award interest to Advatech at the rate of five percent (5%) simple interest per annum, commencing on October 30, 2016,[128] and continuing until the date of the Final Award in this matter. The principal amount for the calculation of interest is the sum of termination payment due to Advatech of $36,835,273 plus the additional amount due for demobilization costs of $77,895, for

[124] Advatech's Reply Pre-Hearing Memorandum, p. 50. Under Illinois law, a construction contract is considered an "instrument of writing" for purposes of the interest statute. *Ameritech Information Systems, Inc. v. Bar Code Resources*, 331 F.3d 571, 575 (2003).

[125] See *Ameritech Information*, 331 F.3d at 575 (owner entitled to prejudgment interest on amount paid contractor for defective work); *Residential Marketing Group, Inc. v. Granite Investment Group*, 933 F.2d 546, 549 (7th Cir. 1991) (the interest statute does not require that the "instrument of writing" specify the exact amount due the creditor; it is enough if it contains a formula from which that amount can be computed with reasonable accuracy).

[126] IPGC Draft Interim Award on Interest at 2 n3 (Jan. 4, 2019).

[127] *Id* at 2.

[128] Advatech submitted its final invoice on September 30, 2016. Pre-award interest shall begin to accrue 30 days thereafter, or on October 30, 2016.

a total principal of $36,913,168. The pre-award interest due and owing to Advatech for the period from October 30, 2016 through March 30, 2019 is $4,454,863, with interest continuing to accrue at a daily rate of $5,056.60 from March 31, 2019 through the date of the Final Award.

Advatech also seeks post-judgment interest in the amount of 9% from the date of the Final Award to the time of payment, pursuant to 735 ILCS 5/2-1303.[129] IPGC contends that the award of statutory post-judgment interest would result in a windfall because the statutory rate in Illinois is 9% and the rate of a 1-year U.S. Treasury instrument of constant maturity is 2.51%.[130] We reject IPGC's logic in light of the determination of the appropriate post-judgment interest rate by the governing authorities in Illinois. Accordingly, Advatech shall be entitled to post-award interest at the simple rate of nine percent (9%) per annum, commencing on the date of the Final Award. For purposes of the calculation of post-award interest, the principal amount shall be the sum of $36,913,168 ($36,835,273 for the termination payment and $77,895 for demobilization costs) plus: a) the amount pre-award interest accrued as of the date of the Final Award ($4,454,863 plus interest accruing at a daily rate of $5,056.60 from March 31, 2019 through the date of the Final Award), and b) the amount of attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other expenses awarded to Advatech in the Final Award.

## B. <u>Legal Fees and Costs</u>

In its arbitration pleadings, each party requests an award of attorneys' fees and expenses. The parties clearly and unequivocally confirmed these requests during the arbitral hearing.[131]

---

[129] In addition to these statutory bases, Rule 48(d)(i) of the AAA Construction Rules expressly authorizes the Tribunal to include interest in the Final Award at such rate and from such date as the Tribunal may deem appropriate.

[130] IPGC Draft Interim Award on Interest at 2 n5 (Jan. 4, 2019).

[131] Hearing Transcript, October 4, 2018, 1229: 1-12.

Accordingly, pursuant to Rule 48(d)(ii) of the AAA Construction Rules, the Tribunal may include an award of attorneys' fees and expenses in the Final Award. In addition to any such award of attorneys' fees and costs, the Tribunal is authorized by Rule 48(c), as well as Rules 55, 56, and 57, to assess AAA fees, arbitrator and arbitration expenses, and arbitrator compensation among the parties in such amounts as the Tribunal determines to be appropriate.

The Tribunal will exercise its authority under Rules 48(c) and 48(d)(ii), and will entertain a petition from Advatech for recovery of its attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other fees or expenses attendant to the arbitration. We will issue a separate order establishing a protocol whereby Advatech shall submit summaries supporting its attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other fees or expenses attendant to the arbitration, IPGC will have an opportunity to object and respond to Advatech's request, and Advatech will have an opportunity for a concise reply.

## V. INTERIM AWARD

We considered all of the parties' allegations and arguments, and chose which of those to address in this Interim Award. This Interim Award is rendered in full and complete accord, settlement and satisfaction of all claims, counterclaims and issues (whether or not addressed herein) that were or could have been submitted in the Arbitration relating to or arising out of the Project or the Contract, except with respect to the quantum of attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other expenses attendant to the arbitration to be awarded to Advatech. Otherwise, and except for those claims granted below, any and all other claims, counterclaims, requests for relief and other issues are hereby expressly denied. In consideration of its analysis as set forth above, the undersigned arbitrators hereby issue their Interim Award:

**INTERIM AWARD: Advatech LLC v. Illinois Power Generating Company**

We award Advatech the amount of $36,913,168 ($36,835,273 for the termination payment and $77,895 for demobilization costs).

In addition, we award simple interest in the amount of 5% per annum beginning October 30, 2016 (30 days after the September 30, 2016 final invoice) and continuing until the date the Final Award issues in this Arbitration on the principal amount of $36,913,168. The pre-award interest due and owing to Advatech for the period from October 30, 2016 through March 30, 2019 is $4,454,863, with interest continuing at accrue at a daily rate of $5,056.60 from March 31, 2019 through the date of the Final Award.

Further, Advatech shall be entitled to post-award interest at the simple rate of nine percent (9%) per annum, commencing on the date of the Final Award. For purposes of the calculation of post-award interest, the principal amount shall be the sum of $36,913,168 ($36,835,273 for the termination payment and $77,895 for demobilization costs) plus: a) the amount pre-award interest accrued as of the date of the Final Award, and b) the amount of attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other fees and expenses awarded to Advatech in the Final Award.

**INTERIM AWARD: Advatech LLC v. Illinois Power Generating Company**

This Interim Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

This Interim Award shall remain in full force and effect until such time as a Final Award is issued by the Arbitral Tribunal.

DATED this 25th day of March, 2019.

ORDERED BY THE ARBITRAL TRIBUNAL:

Donald G. Gavin, Esq. (Chair)

Michael Nuechterlein

Albert Bates, Jr.



RECEIVED
2019 JUN 12 PM 4:37
CLERK
U.S. DISTRICT COURT

# EXHIBIT C

21.2 **Mediation**. In the event that any Dispute arising out of or relating to the Contract Documents is not resolved in accordance with the procedures set forth in Subarticle 21.1, such Dispute shall be subnlitted to mediation, as a condition precedent to arbitration, through any mutually agreed-to mediator. The mediation session shall take place at Owner's facilities unless otherwise agreed to by the Parties. If the mediation process has not resolved the Dispute within thirty (30) Business Days of the mediation session or within such longer period as the Parties may agree to, the Dispute shall be decided by arbitration as set forth below. All negotiations pursuant to this clause are confidential and shall be treated as compronlise and settlement negotiations for purpose of the Federal Rules of Evidence and state rules of evidence. Each Party will bear its own costs for this Dispute resolution phase. The cost of the mediator shall be split evenly between the Parties.

21.3 **Arbitration**. All claims, Disputes, and other matters in question not resolved by mediation between the Parties to the Contract arising out of or relating to the Contract Documents or the breach thereof shall finally be decided by arbitration by a mutually agreed upon arbitrator. The arbitration shall take place at Owner's facilities and be conducted in accordance with the American Arbitration Association Construction Industry Arbitration Rules or a mutually agreed upon set of arbitration rules. This agreement to arbitrate and any other agreement or consent to arbitrate entered into in accordance herewith will be specifically enforceable under the prevailing arbitration law of any court having jurisdiction. Notice of demand for arbitration must be filed in writing with the other Party to the Contract and with the AAA or other mutually agreed to arbitrator. The demand for arbitration must be made within a reasonable time after the Dispute has arisen but in no event prior to thirty (30) Business Days after the mediation session stated under 21.2 above, unless otherwise agreed by the Parties. In no event may the demand for arbitration be made if the institution of legal or equitable proceedings based on such Dispute is barred by the applicable statute of limitations. If the total Dispute, exclusive of interest and arbitration costs, does not equal or exceed one million dollars, the arbitration shall be heard by one neutral arbitrator. If the total Dispute equals or exceeds one million dollars, then the arbitration shall be heard by three neutral arbitrators. Any arbitration may be consolidated with any other arbitration proceedings. Either Party may join any other interested parties. The award of the arbitrator(s) shall be final and binding upon the Parties and specifically enforceable in a court of competent jurisdiction.

21.4 **Continued Prosecution of the Work**. In case of any Dispute which is or may be the subject of mediation, Contractor shall continue to diligently prosecute the Work and maintain its progress, and Owner shall continue to make payments to Contractor for those portions of the Work completed that is not the subject of Dispute in accordance with the Contract.

## ARTICLE 22
## TAXES

22.1 **Payment by Contractor**. The Contract Price includes all federal, state, and local taxes levied on wages and/ or salaries paid to Contractor's employees and all sales/ use tax payable on the Project. In Illinois, building Materials affixed to realty are not subject to sales/ use tax if installed within an Illinois enterprise zone. A copy of the COE (Certificate of Eligibility) for the Site is attached hereto as Exhibit L, which shall be used by Contractor when purchasing qualifying items. Contractor is aware that not all Materials to be purchased by Contractor for the Work will be tax exempt.

22.2 **Indemnification.** Contractor agrees to indemnify and to hold Owner harmless, at Contractor's own cost and expense from any expense, cost or liability resulting from the nonpayment of any taxes or withholding for which Contractor is legally liable.

22.3 **Assurances.** Contractor agrees to present, if so requested by Owner, satisfactory evidence of payment of all taxes and payroll deductions to the proper authorities.